[No. 39184. Department Two. December 22, 1967.]

HIGHLANDS PLAZA, INC., *Appellant*, v. VIKING INVESTMENT CORP., *Respondent.**

*Karr, Tuttle, Campbell, Koch & Granberg*, by *Carl G. Koch* and *Floyd L. Newland*, for appellant.

*Hulbert S. Murray*, for respondent.

DONWORTH, J.—Appellant instituted this action for a decree of specific performance of a contract for the purchase and sale of real property, or, in the alternative, for damages. Appellant has withdrawn its prayer relating to spe-

*Reported in 435 P.2d 669.

cific performance and now seeks only damages. At the close of appellant's case, the trial court granted respondent's motion for dismissal, and this appeal is from judgment entered dismissing appellant's case with prejudice and with costs to respondent.

June 9, 1965, appellant executed an earnest-money receipt[1] and agreement for the purchase of certain vacant real property known as the "Bitter Lake property." The agreement provided, in part, that the purchase price of $200,000 was:

[P]ayable as follows: $5,000.00 as above received hereby acknowledged. $75,000.00 cash, including earnest money receipted herein, as the down payment. Purchaser and seller agree to execute a real estate contract for the balance due seller, payable in monthly payments of $1,500.00, or more, at purchaser's option. Said payments to include interest at the rate of 6% per annum, computed on the diminishing principal balance.

On closing purchaser's [sic] are to receive the deed to the above property. Sellers shall receive a mortgage for the balance of the purchase price which shall be secondary to a first mortgage to be placed with a mortgage company of purchaser's choice for construction purposes. Purchase is made subject to approval of financing within 60 days from the acceptance of this offer. (This last sentence had previously provided for 90 days within which to procure financing.)

The agreement also contained a "time is of the essence" clause.

July 12, 1965, respondent executed the earnest-money receipt and agreement, but interlineated the following handwritten language:

The first mortgage will not exceed 75% of the lending institutions appraisal of the land and improvements.

This counteroffer was accepted by appellant on July 12, 1965.

---

[1] The evidence indicates that it was appellant's intention to build a large apartment building on the property, for which it was to secure financing on the property, such financing to be secured by a first mortgage.

A Mr. Carl Olson and his wife held a vendor's interest in an undivided one-quarter of the subject property under a contract for the sale of the land to respondent. It was clear, therefore, that respondent would need to obtain a release from Mr. Olson of his interest in the property before it could convey clear title to appellant.

July 13, 1965, Mr. Olson wrote a letter to respondent which provided that:

> This letter is to verify the fact that I agree to the following modification of my real estate contract with you. In the event you sell that part of the property known as "311 foot piece on Bitter Lake", which is included in the contract, to Highland Plaza, Inc. for the sum of $200,000.00 with $75,000.00 cash down and the balance of $125,000.00 on a second mortgage, I will release to Viking this tract from the contract and accept an assignment of the second mortgage as a substitute of collateral as per the contract terms. All payments of $1,500.00 per month on the second mortgage paid to me will be applied to the principal balance on the contract and to your current payments on the contract. The interest would be yours and on final settlement you would get the balance of the second mortgage assigned back to you. Or if the second mortgage is paid off in full prior to that date, I will refund to you that portion of the money which would be in excess of $125,000.00 to me. 2nd mortgage to contain usual protective clauses including assignment of rents, subject to assignment on 1st mortgage.

The testimony of appellant's officers indicated that they were never informed of the existence of this letter or of its contents.

September 30, 1965, an extension agreement was executed by the parties amending the earnest-money receipt and agreement. The extension agreement provided, in part, that:

> Earnest Money acceptance date to be extended to Oct. 15, 1965. *Purchaser and Seller agree to change the monthly payments to $700.00 (interest only) for a period of two (2) years or sooner, if occupancy on the apartments is filled to 90% capacity before said date. (Subject to approval by Carl Olson by Oct. 15, 1965.)*

(The portion in italics was handwritten in ink, while the remainder was typewritten.)

October 1, 1965, the first preliminary title report was issued by Washington Title Insurance Company, indicating 15 defects in title, including the interest of Mr. Olson.

Then, on October 22, 1965, a second extension agreement was executed by the parties amending the original earnest-money receipt and agreement. This second agreement, entirely typewritten except for the signatures, provided, in part, that:

Earnest Money *acceptance date* to be extended to Nov. 25th, 1965. Purchaser and Seller agree to change the monthly payments to $700.00 (interest only) for a period of two (2) years or sooner, if occupancy on the apartments is filled to 90% capacity before said date. Subject to approval by Carl Olson by Nov. 25, 1965. (Italics ours.)

Mr. Olson testified that although the agreements were shown to him, he was never given the agreements to sign, nor was he asked to approve the agreements. He testified that he might have signed them had he been asked.

On November 4, 1965, Mr. Olson wrote to appellant as follows, in part:

I have been informed that the purchaser and seller have agreed to an extension of the closing date to November 15, 1965, subject to my approval. Inasmuch as I have an interest in the property being sold in this transaction because of a contract of sale between my wife and me as sellers and Viking Investment Corporation as described in Exception No. 4 in the Second Preliminary Commitment for Title Insurance issued by Washington Title Insurance on November 2, 1965, I do hereby approve the extension of the *closing date* and to such further extensions as may be required *not beyond December 15, 1965*. I agree further to cause my vendor's interest in the property which is the subject of this sale to pass by deed release to Viking Investment Corporation as purchaser, provided the conditions hereinafter stated are met by Viking Investment Corporation.

You are giving a note and a second mortgage in the amount[2] of $125,000.00 on the Highlands Plaza Medical Center at 1306 North 175th, Seattle, Washington as part of the purchase price of the Bitter Lake property. The second mortgage on the Medical Center shall bear interest at 6 per cent per annum on outstanding balances and shall be payable in monthly installments of *$750.00 or more* for the first two years and thereafter in monthly installments of $1,500.00 or more. The first mortgage is in the amount of not over $310,000.00 payable at $2,368.25 per month including interest.

I will agree that such second mortgage may be used as substituted collateral on the sales contract I have with Viking Investment Corporation, provided that effective December 15, 1965 such sales contract is modified to provide that balances will bear interest at 6% per annum[3] and that any payment received on such second mortgage will be used to apply on my contract with Viking Investment Corporation. Other terms of such second mortgage shall be subject to my approval. (Italics ours.)

A copy of this letter was forwarded by Mr. Wilson, president of Highlands Plaza, Inc., to Washington Title Insurance Company as escrow holder.

Also, on November 4, 1965, Mr. Olson wrote a second letter to Highlands Plaza, Inc., in which he stated:

I have agreed with Viking Investment Corporation that they may substitute a second mortgage in the amount of $125,000 on the Highlands Plaza Medical Center as collateral security on their sales agreement with me.

I would further be willing to provide for a second substitution as follows: A second mortgage in the same amount, less any payments made, on the Bitter Lake property when the improvements on the Bitter Lake property have been completed and the net income requirements are as follows: The net income without

---

[2]The offer of a second mortgage on the Highlands Plaza Medical Center was made by appellant in an attempt to assist respondent in procuring Mr. Olson's release of his interest in the property.

[3]The provision for interest on Viking's contract with Olson was the basis for respondent Viking's refusal to consent to the substitution. There is some testimony to the effect that appellant was never, before the receipt of the December 17th letter, informed that the mortgage on the medical center would not be satisfactory.

depreciation shall be sufficient to provide for amortization of the first mortgage on the property and $1,900 per month in addition. Such net income shall be proven for a reasonable length of time and shall be based upon leases or tenancies that are established and have a reasonable expectancy of continuation.

December 17, 1965, respondent Viking wrote to appellant, outlining the terms of the original earnest-money agreement and receipt, and noting that:

The purchase was made subject to approval of financing within sixty days from the date we accepted your offer, which was July 12, 1965. The transaction was to be closed in escrow within thirty days after the title report was furnished to you by us or completion of financing, whichever is later. The title report was furnished to you on October 1, 1965.

The letter further stated that at all times from and after October 1, 1965, respondent was able to clear all exceptions, except the covenants running with the land. (However, there is no evidence whatsoever that any action was taken by respondent toward clearing the defects, and particularly Mr. Olson's one-fourth interest in the Bitter Lake property.) The letter concluded:

Accordingly, we do hereby demand that you immediately submit to us your financing plans for our approval, and further that you deposit in escrow the $75,000.00 downpayment called for by the Earnest Money Receipt and Agreement. In the event you fail to do one or both of these conditions, or in the event we should disapprove of your financing plan, by 4:00 p.m. December 24, 1965, said Earnest Money Receipt and Agreement shall thereby become null and void. In this latter connection, we have instructed Picture Floor Plans, Inc., the real estate agent, to release and return to you your promissory note in the sum of $5000.00 upon your demand.

Appellant received the above letter from Viking on December 20, 1965.

Then, on December 23, 1965, appellant received from Securities Mortgage Company a letter which stated that:

This is to inform you and other interested parties, that Securities Mortgage Company can arrange mortgage fi-

nancing for you in connection with your Bitter Lake development. As you know, we have been working since last August with you and your associates, including Blaine McCool. We have reviewed your proposed plans for the development of the site and feel this is a very excellent proposal, which has met with the approval of our insurance principal.

We therefore, will be arranging for you, a mortgage loan not to exceed 75% of the appraised value of the project and will be pleased to assist you in any way possible to commence construction of the proposed project.

Also, on December 23, 1965, appellant deposited with the escrow agent the remaining $70,000 of the down payment; escrow instructions; a promissory note for $125,000 calling for monthly payments of $700 per month for 2 years and thereafter installments of $1,500 per month; and a statutory mortgage.[4]

The following Tuesday, a representative of respondent advised the escrow agent that respondent was not going through with the transaction, stating several objections to the documents deposited by appellant. Appellant thereafter commenced this action for specific performance, or, in the alternative, for damages. As stated, the claim for specific performance has been abandoned, and only damages are sought at this time.

The trial court's findings of fact, in part, provided as follows:

VIII. That court finds that both the plaintiff and the defendant then [following Olson's letters of November 4] knew that they were required to get Mr. Olson's approval of the terms and conditions of the second mortgage different than those contained in plaintiff's Exhibit

---

[4] The mortgage contained a provision reading, in part, as follows: ". . . mortgagor promises and agrees . . . to keep all improvements on said described premises insured against loss or damage by fire in the sum of None—Vacant Land." This is one of the matters respondent contended was unsatisfactory, it being his contention that appellant was to guarantee to insure the building which was to be built on the land. Mr. Medema, manager of escrow department at Pioneer National Title Company, indicated that the insertion of the clause omitting insurance was his own doing, not that of appellant.

No. 10 [Olson's letter of July 13, 1965], and as set forth in plaintiff's Exhibit No. 5 [the second extension agreement], in writing and on or before December 15, 1965. The court finds that no such approval was secured on or before December 15, 1965.

Between November 15, 1965 and December 17, 1965, there were a series of acts, transactions and conduct by plaintiff and defendant and by defendant's real estate agent and the escrow agent which were directed toward the completion and closing of some kind of purchase and sale.

IX. All transactions and dealings between plaintiff and defendant subsequent to December 15, 1965, to-wit: defendant's letter of December 17, 1965; the escrow deposits of funds; promissory note payable to the order of defendant in the sum of $125,000.00 . . .; the Real Estate Mortgage executed by plaintiff securing said promissory note . . .; and the letter of Securities Mortgage Company . . . are nothing but offers and counteroffers in an effort to come to some meeting of the minds in an effort to make a contract. The court finds that there was no meeting of the minds on anything after December 15, 1965.

X. The court further finds that throughout this entire transaction there was no change of position on the part of plaintiff which resulted in any detriment to it. The court further finds that there was no actual fraud claimed or practiced by either party, nor was either party misled in any way.

. . . .

XIII. If there had been an enforceable contract between the parties, and if the plaintiff had paid the down payment and performed the other requirements set forth in the Earnest Money Receipt and Agreement . . . defendant could have cleared all of the encumbrances set forth in the Title Insurance Report dated October 1, 1965.

The court's conclusions of law read, in part, as follows:

I. The court finds that there was no meeting of the minds on anything after December 15, 1965.

. . . .

III. That the defendant, VIKING INVESTMENT CORPORATION, is entitled to a Judgment in this action dismissing

this cause with prejudice and with the taxation of costs in favor of the defendant and against the plaintiff.

Although appellant makes 14 assignments of error, many of which are based on portions of the above-quoted findings and conclusions, its position depends upon certain pivotal contentions which are summarized in appellant's brief as follows:

First: That since the time for closing had not yet arrived, (by virtue of a proper construction of the extension agreements, by virtue of Viking's waiver of the time is of the essence clause, or because Highlands Plaza was faced with a prospective failure of consideration) the demand by Viking for closing and its renunciation of its contractual obligations if closing did not occur by December 24, 1965, constituted a repudiation of the contract and total breach thereof because Viking's demands required the following three acts which Highlands Plaza was not obligated to perform, namely closing by December 24, 1965, complete performance by Highlands Plaza before the tender of any performance by Viking, and the submission of financing plans to Viking for Viking's approval when Highlands Plaza had no obligation to furnish such financing plans.

Second: Viking by undertaking to obtain Mr. Olson's approval and not obtaining such approval and not telling Highlands Plaza that such approval had not been obtained waived the necessity of such approval and, accordingly, Highlands Plaza's tender of performance met all of the terms of the earnest money agreement as amended by the two extension agreements.

We first consider the intent and effect of the extension agreements, for, as pointed out by appellant, respondent's arguments stand or fall upon the determination of whether there was or was not an existing contract on December 17, 1965.

In its oral decision, the trial court stated that:

[O]n September 30, 1965, by Plaintiff's Exhibit 4 [the first extension agreement], there was an attempt to extend the earnest money acceptance date to October 15, 1965 which would have the effect of extending the closing date, something different than if we use the title

insurance. This was not approved by Mr. Olson by the extended date time even.

Then comes Plaintiff's Exhibit 5, which is another amendment. I would say that there was something to argue here that on Exhibit No. 4, the "Subject to approval by Carl Olson" then applied to the $700 change.

But by October 22, 1965, I think the thing had changed. I think the "Subject to approval by Carl Olson by Nov. 25, 1965" applied to the whole document.

Not because it is particularly typed the way it is, but because it fits the circumstances. Because Mr. Olson at that time, as he was at the time before, and particularly at that time he was a key to this whole deal, and I think they both knew it; everybody knew it.

The trial court, thus concluding that Mr. Olson's approval was required for the extension of the closing date as contemplated by the second extension agreement, held that, since no such approval was obtained at least for any extension of time beyond December 15, the agreement expired on that date and the subsequent dealings of the parties were merely offers and counteroffers in an unsuccessful attempt to form a new contract.

However, we view the matter differently. We agree with the trial court that Mr. Olson's approval was not needed for the first extension of time, but was a condition only to the reduction of payments. Such an interpretation is warranted both by the circumstances of the parties and by the form in which the agreement was drawn. See *supra* p. 867. The second agreement differs from the first only in the dates involved and in the fact that the second agreement is entirely typewritten. In addition, we find no *change of circumstances* by the time the second agreement was made on October 22, 1965, which would warrant a different interpretation of the second extension agreement than was given the first.

Therefore, we disagree with the trial court's conclusion that the second extension agreement was ineffective because it lacked Mr. Olson's approval.

We conclude that at the time the second extension agreement was signed on October 22, 1965, Mr. Olson's approval

was intended to condition only the reduction of payments, not the extension of time.

Further, even if it could be established that it was the intent of the parties to the second extension agreement that Mr. Olson's approval would be required for the extension of time, we would have to conclude that that requirement was excused by the actions of respondent seller, with the effect that the parties were bound by the agreement for the extension of the acceptance date notwithstanding the fact that Mr. Olson's approval was not specifically given for such extension.

It must be kept in mind that respondent seller contracted to convey property. It was its duty, under the original agreement, to procure clear title. In order to do so it was necessary that it obtain a release from Mr. Olson of his undivided one-fourth interest in the property. Again, we stress that this was the obligation of the seller, respondent, and not the buyer, appellant.

Appellant did attempt to assist in obtaining the release from Mr. Olson, but did so only at the request of respondent. Thereafter, respondent's agent instructed the real-estate agent to inform appellant that the corporation should not negotiate with or deal with Mr. Olson any further. The testimony of Mr. Sanwick, president of respondent corporation was that:

> Q. Let me say it again so you understand it. Did you ever tell anyone that the purchasers should stop dealing directly with Mr. Olson because you wanted to clear title to the property yourself, in your own manner? A. I advised Mr. Mooremeier and was in the room when Mr. Detrich advised Mr. Mooremeier that he should tell his clients that any negotiations conducted on this property should be done with only one person, in this case myself, and in my absence with Mr. Detrich, that no one else, specifically Mr. Parker, or Mr. Olson, had any authority to either negotiate or to commit or even knew what the deal was about. Q. All right, When did this discussion take place? A. More than once. Q. Tell us when. A. I don't remember. Q. How many times? A. Three or four.

Mr. Sanwick further testified that such statements by him were made in October or November, 1965.

Mr. Mooremeier testified that:

Q. Did you take them [Exhibits 4 & 5] to Mr. Olson for his approval? A. No, sir, I did not. Q. Why was that? A. Because Mr. Parker told me that any arrangement with Carl Olson, that they would handle— Q. Who is "they"? A. Viking investment. The approval of Carl Olson was for the benefit of Viking, not the purchasers. He told me that I just forget Carl Olson, that I wouldn't have to worry about Carl Olson, that that wasn't my—I didn't play an important part in that matter. Q. Did Mr. Parker say that Viking would take care of the submission of Mr. Olson? A. Well, yes. Mr. Murray: If your Honor please, I object to the leading questions. The Court: Sustained. Mr. Murray: Counsel is continually leading. Q. (By Mr. Koch) Will you relate any conversation that you had with Mr. Parker with respect to who would submit it, if anybody, to Mr. Olson? A. That Viking would submit any arrangement to Mr. Olson.

Mr. Olson testified that:

Q. Handing you Plaintiff's Exhibits Nos. 4 and 5, which are entitled "Mutual Agreement to Amend Deposit & Purchase Agreement" have you ever seen those papers before the last day or so? A. Yes. Q. You have seen them before? A. I have. Q. When did you see them? A. I think around November 4th. . . . Q. (By Mr. Koch) Do you see where each of these say they are subject to the approval of Carl Olson? This one says, No. 4, "by October 15, 1965" and No. 5 says, "by November 25, 1965." Were you ever asked to approve of those exhibits, those amendments to the earnest money? A. No. . . . Q. Had you been asked to approve those documents at the dates indicated would you have done so? A. At that time I might have, yes.

◼ In 5 S. Williston, Contracts § 677 (3d ed.), it is said:

It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.

In reflecting upon this jural proposition, a federal court has observed that "Where liability under a contract de-

pends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it."

The rule is set forth in Restatement of Contracts, § 295, as follows:

> If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty, unless
>
> (a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party; or
> (b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party.

It should be pointed out that we find neither of the exceptions (a) or (b) above, to be present in this case. We are aware that appellant received a letter from Mr. Olson on November 4, 1965, which indicated that Olson had, at that time, apparently misunderstood the terms of the extension agreements or had not agreed to the terms of the agreements. However, Olson's approval to the second extension agreement was not required until November 25, 1965. Respondent seller had instructed appellant not to deal with Olson directly, and at least impliedly promised that it, respondent, would take care of Mr. Olson. Appellant could justifiably assume that respondent was aware of whether or not Olson's approval had been obtained to the agreements. Nothing was required of appellant as a result of the letter of November 4, 1965, from Mr. Olson. Consequently, we find nothing in appellant's failure to act in response to that letter, which would change our conclusion.

That conclusion is that the extension agreements were effective as to the extension of time notwithstanding the lack of Olson's approval, either because the parties intended such a result, or because the conduct of respondent

seller, in failing to seek Olson's approval as it had impliedly promised to do, excused such condition to the effectiveness of the extension of time agreements.

Under such extension agreements, appellant was not required to perform until the expiration of 60 days from the acceptance date of November 25, 1965, *i.e.* January 24, 1967. The demand by respondent, which was sent December 17, 1965, was well ahead of the date on which appellant's performance was due.

In *Casey v, Murphy*, 14ᐃ Wash. 17, 18, 253 Pac. 1078 (1927), we said:

> The rule is that a positive refusal to perform a contract before performance is due may be regarded as a breach, and the injured party can bring an action without delay.

See, also, *McFerran v. Herroux*, 44 Wn.2d 631, 269 P.2d 815 (1954), and Restatement of Contracts, § 318.

It is further the rule that, where such a breach occurs, no tender of performance by the promisee (appellant) is necessary to his right to recovery against the promisor who has breached the contract. See 5 S. Williston, Contracts § 699 (3d ed.). Therefore, appellant's defective tender of performance (if, in fact, it was defective, a question we do not reach on this appeal) is of no consequence.

■ In summary, on the basis of the evidence in the record, we conclude that appellant and respondent mutually agreed to the extension of time modification to their original earnest-money agreement. Such modification agreement was effective (either because it was unconditionally so from the start or because respondent's conduct excused any condition to its effectiveness) to extend the time for performance on the part of appellant to January 24, 1966. Respondent's demand, made on December 17, 1965, therefore, was premature and constituted a repudiation of the contract. Such repudiation constitutes a breach of contract for which appellant may recover damages.

However, since the case was dismissed below at the conclusion of appellant's case, we do not intend to limit the evidence which may be presented on retrial to the issue of

damages. Respondent is entitled to present whatever evidence it may have, if any, bearing on the question of liability.

The decision of the trial court, dismissing appellant's case with prejudice, is reversed and the cause is remanded to the trial court for retrial. If liability is found, consistent with the views expressed in this opinion, the court shall then determine the damages, if any, to which appellant may be entitled.

FINLEY, C. J., HILL, HUNTER, and NEILL, JJ., concur.