1998-NMCA-086

961 P.2d 175

**James R. GILMORE, Plaintiff–
Appellant/Cross–Appellee,**

v.

**Robert DUDERSTADT, Laura Duder-
stadt, and Laubo Corporation, Defen-
dants–Appellees/Cross–Appellants.**

**No. 17613.**

Court of Appeals of New Mexico.

May 28, 1998.

Mark E. Komer, The Roehl Law Firm, P.C., Albuquerque, for Plaintiff–Appellant.

Michael L. Danoff, Michael Danoff & Associates, P.C., Albuquerque, for Defendants–Appellees.

## OPINION

FLORES, Judge.

{1} This appeal and cross-appeal arise from a breach of contract action involving an agreement between Plaintiff James R. Gilmore (Gilmore) and Defendants Robert and Laura Duderstadt (the Duderstadts) to operate and purchase the Duderstadts' fast-food restaurant business, Defendant Laubo Corporation (Laubo). On appeal, Gilmore contends that the trial court erred in (1) directing a verdict in favor of the Duderstadts and Laubo (collectively, Defendants) on his breach of contract claim relating to the purchase portion of the contract; (2) directing a verdict on his claim for punitive damages; and (3) denying his costs. In their cross-appeal, Defendants challenge the sufficiency of the evidence supporting the jury verdicts in favor of Gilmore on his claims for breach of contract relating to the employment portion of the contract and negligent misrepresentation. Defendants also contest the award of prejudgment interest in favor of Gilmore, and claim that they are entitled to their post-offer of judgment costs under Rule 1–068 NMRA 1998.

{2} We reverse the trial court on all issues raised in the direct appeal, affirm on the issues raised in the cross-appeal and remand for a new trial on the merits of the breach of contract claim relating to the purchase por-tion of the contract and to determine whether punitive damages should be awarded.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{3} The Duderstadts are the sole shareholders of their closely-held corporation, Laubo, which owns and operates several Arby's fast-food restaurants in New Mexico. The Duderstadts own the underlying real estate and three restaurant buildings. The Duderstadts lease this property to Laubo. In June 1992, Gilmore entered into a written contract with the Duderstadts to run Laubo on a trial basis and, if certain conditions were met, to purchase the company in a "boot-strap" sales transaction by which the Duderstadts would essentially finance most of the purchase price.

{4} The contract between Gilmore and the Duderstadts consisted of two main parts: (1) an employment agreement and (2) an option to purchase. Under the employment portion of the contract, Gilmore was to be employed by Laubo as its president and CEO for a one-year period from June 1, 1992 to May 31, 1993. This period became known as the "trial period." It was to evaluate whether Gilmore was a capable manager and could run the business profitably enough to acquire it under the terms of the bootstrap sale. During the trial period, Gilmore was to be paid a base salary of $52,000. If, at the end of the trial period, Gilmore made a 10% net profit from Laubo's operations, he would receive a bonus calculated in accordance with a formula in the contract and be able to exercise the option to purchase Laubo in the bootstrap acquisition under the purchase portion of the contract. To exercise the option, Gilmore was required to give written notice of his intent to exercise within thirty days after the end of the trial period. If Gilmore did not make the 10% profit during the trial period, or elected not to exercise the option, he would forfeit a $50,000 escrow deposit set up at the outset of the contract, would not receive a bonus, and would lose the right to purchase the business.

{5} The contract provided that the parties were to exercise good faith and due diligence in implementing the terms of the

contract and in satisfying the conditions necessary to consummate the sale of the business. The contract did not expressly provide for the rent to be paid by Laubo during the trial period.

{6} In June 1992, Gilmore began operating Laubo on a trial basis. In July 1992, the Duderstadts increased the rent on their properties from $15,000 to over $22,000 per month, an increase of over $7,000 per month. Gilmore objected to the rental increase. He had been under the impression that during the trial period, the rent would remain at $15,000 per month and that he would be held to the same level of expenses as the Duderstadts were subject to during the twelve months preceding the contract. Gilmore paid the increased rent during the trial period, believing that Mr. Duderstadt would offset his payment of "excess rent" when calculating Gilmore's profits at the end of the trial period.

{7} In May 1992, Gilmore requested an extension of the trial period for three months, beginning May 31, 1993. At that time, Mr. Duderstadt's only response was, "we'll see." However, Gilmore stayed employed at Laubo until October 29, 1993. At no time from May 31, 1993 to October 29, 1993, did the Duderstadts ever inform Gilmore that the trial period was over, or that he no longer had the right to purchase the business because he had not made the ten percent profit. Mr. Duderstadt also calculated Gilmore's profitability through October 1993. On October 29, 1993, Mr. Duderstadt terminated Gilmore's employment, expressing dissatisfaction with the transaction and insecurity over getting paid under the bootstrap agreement. Mr. Duderstadt then offered to sell Laubo only if Gilmore could obtain an additional $200,000. Gilmore, could not meet this new term. On November 30, 1993, Gilmore tendered written notice of his intent to exercise the option to purchase.

{8} In the complaint Gilmore eventually filed, he alleged that the Duderstadts breached the contract in bad faith by increasing the rent during the trial period in an attempt to prevent him from making the 10% net profit that was a condition of his option to purchase. Gilmore also claimed that, during the contract negotiations, the Duderstadts negligently misrepresented the amount of rent to be charged during the trial period.

{9} At trial, Gilmore relied on several theories to support his breach of contract claim for compensatory damages based on the option to purchase. His primary claim was that, by raising the rent, the Duderstadts breached express promises in the contract "to exercise good faith and due diligence" in satisfying the conditions and implementing the terms of the contract. Gilmore further claimed that the increase in rent violated the implied covenant of good faith and fair dealing. Finally, he asserted that the increase in rent constituted an anticipatory repudiation of the Duderstadts' promise to consummate the sale of the business under the contract, which excused his failure to exercise the option on the date in question.

{10} At the close of Gilmore's evidence, Defendants moved for a directed verdict on Gilmore's breach of contract claim for compensatory and punitive damages, arguing that Gilmore had failed to meet the 10% net profit condition and had failed to timely exercise the option to purchase. The trial court granted Defendants' motion for a directed verdict in part, dismissing the breach of contract claim for compensatory damages based on the option to purchase. The trial court ruled that because the issue of anticipatory repudiation was not raised in the pretrial order, Gilmore could not claim that the Duderstadts repudiated the contract by increasing the rent during the trial period. Thus, the trial court reasoned, there was nothing to excuse Gilmore's failure to give timely written notice of his intent to exercise the option.

{11} In directing the verdict, the trial court limited Gilmore's claims and relief to the following: (1) his breach of contract claim for the bonus under the employment portion of the contract and (2) his negligent misrepresentation claim for the return of his $50,000 escrow deposit. Although the trial court allowed the parties to present evidence on the issue of punitive damages, it refused to instruct the jury on the issue at the close of the case. The jury returned verdicts in favor of Gilmore on both his breach of contract and

negligent misrepresentation claims for $12,-266.39 and $50,000, respectively. The trial court also awarded prejudgment interest in favor of Gilmore on both jury awards and ordered the parties to bear their own costs and attorney's fees.

## II. *DISCUSSION*

### A. *Directed Verdict*

#### 1. *Standard of Review*

■ {12} "A directed verdict is appropriate only when there are no true issues of fact to be presented to a jury." *Sunwest Bank v. Garrett,* 113 N.M. 112, 115, 823 P.2d 912, 915 (1992). "Directed verdicts are not favored and should only be granted when a jury could not logically and reasonably reach any other conclusion ." *In re Estate of Kimble,* 117 N.M. 258, 260, 871 P.2d 22, 24 (Ct.App. 1994). A reviewing court is to consider all evidence, and any conflicts in the evidence or reasonable interpretations of the evidence are to be viewed in favor of the party resisting the directed verdict. *Garrett,* 113 N.M. at 115, 823 P.2d at 915. Thus, "if reasonable minds can differ on the conclusion to be reached under the evidence or the permissible inferences to be drawn therefrom, the question is one for the jury and it is error to direct a verdict." *Melnick v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, 728, 749 P.2d 1105, 1107 (1988).

#### 2. *Pretrial Order*

■ {13} The trial court dismissed anticipatory repudiation as a theory of the case after determining that the issue had not been raised in the pretrial order. Initially, we determine that the issue was sufficiently set forth in the pretrial order.[1] *See State ex rel. Highway Dep't v. Branchau,* 90 N.M. 496, 497, 565 P.2d 1013, 1014 (1977) ("The pretrial order determines the issues and becomes the

law of the case."); *see also United Nuclear Corp. v. General Atomic Co.,* 93 N.M. 105, 120, 597 P.2d 290, 305 (1979) (parties limited to issues contained in pretrial order and may not introduce new issues at trial).

{14} Viewing the allegations of the pretrial order and the complaint together, we find the issue of anticipatory repudiation was fairly presented in the pretrial order. Although the pretrial order was worded somewhat generally and could have been more precise in defining the legal issues, we nonetheless conclude that sufficient factual contentions were set forth in the pretrial order to support a theory of repudiation and to alert Defendants that such a claim was being asserted. *See Mantz v. Follingstad,* 84 N.M. 473, 478–80, 505 P.2d 68, 73–75 (Ct.App.1972) (in determining whether legal theory was properly dismissed at trial, reviewing court looks to factual contentions in pretrial order); *see also Branchau,* 90 N.M. at 497, 565 P.2d at 1014 (purpose of the requirement that issues be limited by pretrial order is "to prevent surprise and to get away from the 'sporting' theory of justice"). Here, Defendants cannot claim to be without notice of, or ambushed by, the claim of anticipatory repudiation being asserted at trial. Therefore, we conclude that the trial court erred in dismissing the claim of anticipatory repudiation on the ground that it was not explicitly raised in the pretrial order.

#### 3. *Anticipatory Repudiation*

■ {15} To establish a repudiation justifying nonperformance of a condition of the contract, the plaintiff must be able to show that the defendant's words or acts evinced " 'a distinct, unequivocal, and absolute refusal to perform according to the terms of the agreement.' " *Hoggard v. City of Carlsbad,* 1996–NMCA–003, ¶ 6, 121 N.M. 166, 909 P.2d 726 (quoting *Viramontes v. Fox,* 65 N.M. 275, 282, 335 P.2d 1071, 1075 (1959)); *see also*

---

1. The pretrial order stated, as one of Gilmore's claims, that "Defendants intentionally and without justification increased the expenses of Laubo Corporation with the intent to harm [Gilmore] and thwart the purposes of the written contract." The pretrial order also provided that "[t]he contested issues of fact and law are implicit in the ... claims [set forth in the pretrial order]." Further, the pretrial order specifically incorporated the allegations of the complaint. The complaint alleged that "[r]aising the rent was a direct attempt on the Duderstadts' part to prohibit ... Gilmore from achieving the ten percent (10%) profit figure which was the contingency for the purchase of the corporation." The complaint also alleged that the Duderstadts ultimately "breached the contract by failing to enter into sale of Laubo Corporation to Gilmore ...."

Restatement (Second) of Contracts § 250(b) (1981) [hereinafter Restatement]. "Words or acts which are only 'doubtful and indefinite statements' regarding performance, do not repudiate a contract." *Hoggard,* 1996–NMCA–003, ¶ 6, 121 N.M. 166, 909 P.2d 726 (quoting 4 Arthur L. Corbin, *Corbin on Contracts* § 973, at 905 (1951)) [hereinafter Corbin].

{16} Here, Gilmore alleges that the Duderstadts' act of increasing rent during the trial period was "so at odds" with the contract as to rise to the level of a "distinct, unequivocal and absolute refusal to perform" according to its terms. A party's refusal to perform its obligations except upon terms that go beyond the original contract may, under certain circumstances, amount to a repudiation of the contract. As Professor Corbin observed in his treatise: "If one party to a contract, either wilfully or by mistake, demands of the other a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed." Corbin, *supra,* § 973, at 910; *see also Placid Oil Co. v. Humphrey,* 244 F.2d 184, 188 (5th Cir.1957) (holding repudiation where defendant refused to perform unless plaintiffs fulfilled new condition not required by contract); Restatement, *supra,* § 250 cmt. b (Noting that under Section 2–610 of the Uniform Commercial Code, "language that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation.").

{17} Viewing the evidence in the light most favorable to Gilmore, we hold that a jury could reasonably conclude from the evidence presented during the case in chief that the Duderstadts did not intend to perform their promise to sell Laubo unless Gilmore paid the increased rent and still achieved the 10% net profit. Gilmore presented evidence creating issues of fact about whether the rental increase went beyond the terms of the contract. The contract did not expressly provide for an increase in rent during the trial period. The financial records reviewed by Gilmore prior to entering into the contract revealed that the Duderstadts had been charging Laubo rent of approximately $15,000 per month. The financial statements reviewed by Gilmore also failed to show any accrual of liability for back-due rent. Gilmore testified that when he entered into the contract, he expected that the rent would remain $15,000 per month during the trial period, and that he would be judged on the same criteria as the Duderstadts in the previous year. He testified that he did not realize until reviewing the July 1992 books for Laubo that the Duderstadts had unilaterally started charging rent in excess of $22,000 per month and that this amount was charged against Gilmore's net profit. Moreover, he testified that had he known that the Duderstadts were going to increase the rent by $7,559 per month during the trial period, he would not have agreed to the terms of the sale, because the 10% net profit condition would not have been feasible. Finally, Gilmore testified that, based on his understanding of the contract, he was not supposed to be charged rent based on the higher rate of $245,000 per year until after acquiring Laubo in the bootstrap sale. Thus, because the jury could have reasonably found from the evidence that the Duderstadts imposed a new condition of performance contrary to the original contract, we conclude that Gilmore presented sufficient evidence on the issue of repudiation for the jury to determine.

{18} Defendants argue, however, that the Duderstadts' act of increasing the rent did not rise to the level of a "distinct, unequivocal, and absolute refusal to perform" because Mr. Duderstadt had offered to make an adjustment for the rental increase at the end of the trial period. We reject this argument. In his reply brief and at oral argument, Gilmore correctly noted that a repudiation may be retracted or withdrawn. Here, there is evidence that the Duderstadts failed to retract, despite Gilmore's urging that they do so. *See* Restatement, *supra,* § 257 (noting that plaintiff does not change the effect of a repudiation by urging the repudiating party to perform or retract the repudiation).

{19} A retraction, if effective, restores the contract to its original condition

and places the parties in the same legal position as before the repudiation. *See* Restatement, *supra,* § 256 cmt. a (if a repudiation is nullified it eliminates all consequences of a repudiation). Thus, a retraction reinstates the obligations of the other party, including any conditions precedent, so that the performance of such conditions is once again necessary before the repudiating party can be charged with breach. Corbin, *supra,* § 980, at 933. However, a retraction, to be effective, must be clear and unequivocal; it may not impose new conditions not in accord with the original contract. *See Pichignau v. City of Paris,* 264 Cal.App.2d 138, 70 Cal. Rptr. 147, 149 (1968); *Vahabzadeh v.. Mooney,* 241 Va. 47, 399 S.E.2d 803, 805 (1991) (holding that to be effective, a retraction must meet the same standard as repudiation and, therefore, "must be clear, definite, absolute, and unequivocal in evincing the repudiator's intention to honor his obligations under the contract").

{20}  Based on the evidence presented at trial, we cannot conclude that, as a matter of law, Mr. Duderstadt's offer to make an adjustment for the rental increase was sufficiently definite to amount to a retraction. Although Mr. Duderstadt apparently did offer to make some adjustment for the rental increase, the evidence is unclear about when this offer was made and how the adjustment was to be calculated, including whether the adjustment would be for the full amount of the rental increase. Moreover, based on the evidence presented regarding the Duderstadts' words and actions during the contract negotiations and the trial period, reasonable minds could differ on whether the Duderstadts ever intended to follow through with any proposed retraction by adjusting the net profits for the rental increase at the end of the trial period. Finally, by terminating Gilmore and refusing to go forward with the sale unless Gilmore paid the Duderstadts an extra $200,000, the Duderstadts apparently sought to impose a new condition not in accord with the original contract, thereby defeating any attempted retraction. *See Pichignau,* 70 Cal.Rptr. at 149. Thus, because the evidence does not conclusively establish a retraction by the Duderstadts, we hold that Gilmore presented sufficient evidence enti-

tling the jury to consider the issue of anticipatory repudiation. If, upon retrial, anticipatory repudiation is proven, Gilmore would be entitled to his compensatory damages for total breach. *See* Restatement, *supra,* § 253(1) (holding that "repudiation alone gives rise to a claim for damages for total breach").

{21}  Defendants argue that the trial court properly directed a verdict on Gilmore's breach of contract claim based on Gilmore's failure to submit timely written notice of his intent to exercise the option to purchase. Relying on *Western Commerce Bank v. Gillespie,* 108 N.M. 535, 775 P.2d 737 (1989), Defendants assert that, because timely written notice was a condition precedent to the sale of Laubo under the terms of the contract, Gilmore has no breach of contract claim unless he can prove that he performed the condition precedent or was prevented from doing so by the Duderstadts' acts.

{22}  Defendants ignore the firmly rooted principle of contract law that, in the case of a bilateral contract for an exchange of performances, one party's repudiation of its duty to perform discharges the other party's remaining duties of performance under the contract. *See* Restatement, *supra,* § 253(2) cmt. b; Corbin, *supra,* § 975, at 916. Thus, the fact that the notice was untimely would be excused by any factual finding by the jury that the Duderstadts repudiated the contract by increasing the rent during the trial period. *Cf. Gibbs v. Whelan,* 56 N.M. 38, 41–42, 239 P.2d 727, 730 (1952) ("A party to a contract cannot take advantage of his own act or omission to escape liability thereon."); *Highlands Plaza, Inc. v. Viking Inv. Corp.,* 72 Wash.2d 865, 435 P.2d 669, 677 (1967) (noting that upon anticipatory breach, tender of performance by other party is not necessary for breach of contract recovery, and plaintiff's defective tender of performance was of no consequence). Thus, we hold that the trial court erred in ruling, as a matter of law, that Gilmore's failure to submit timely written notice of his intent to exercise the option was not excused by the Duderstadts' prior act of increasing the rent during the trial period. *See Ledbetter v. Webb,* 103

N.M. 597, 602–03, 711 P.2d 874, 879–80 (1985) (recognizing that appellate court may reverse trial court's judgment when it is based on an erroneous conclusion of law).

### 4. Breach of Express and Implied Covenants of Good Faith

{23} The contract in this case expressly imposed the duty of good faith and due diligence on the parties to satisfy the conditions and implement the terms of the contract. Gilmore contends that the trial court erred by directing a verdict which prevented the jury from considering whether the Duderstadts breached these express covenants by increasing the rent and interfering with his ability to make the 10% net profit during the trial period. Although the trial court instructed the jury on the duty of good faith and fair dealing, the jury was allowed to consider the issue only in connection with Gilmore's breach of contract claim for the bonus. We hold it was error for the trial court to so limit Gilmore's claim of breach of contract to the amount of the bonus. *See Clark Leasing Corp. v. White Sands Forest Prods., Inc.,* 87 N.M. 451, 456, 535 P.2d 1077, 1082 (1975) (recognizing that motions for directed verdicts are not normally directed to bits and pieces of an action).

{24} "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Watson Truck & Supply Co. v. Males,* 111 N.M. 57, 60, 801 P.2d 639, 642 (1990); *see also* Restatement, *supra,* § 205. The implied covenant of good faith and fair dealing "requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp.,* 117 N.M. 434, 438, 872 P.2d 852, 856 (1994). Whether there has been a breach of the covenant of good faith and fair dealing is a factual inquiry that focuses on the contract and what the parties agreed to. *See id.* at 439, 872 P.2d at 857. A party breaches the covenant of good faith and fair dealing when he or she interferes or fails to cooperate in the other party's performance. Restatement, *supra,* § 205 cmt. d.

{25} Based on the evidence presented in the case in chief, the jury could have reasonably concluded that the Duderstadts breached express or implied covenants of good faith by increasing the rent during the trial period. Gilmore presented evidence demonstrating that he had justifiable expectations concerning the amount of monthly expenses to be charged during the trial period and that, by increasing the rent, the Duderstadts directly interfered with his ability to make a 10% net profit during a critical juncture under the contract. Upon proving breach of the covenant of good faith, Gilmore would be entitled to recover on the contract, including all damages naturally flowing from the breach. *See Camino Real Mobile Home Park Partnership v. Wolfe,* 119 N.M. 436, 443, 891 P.2d 1190, 1197 (1995). We therefore hold that the trial court erred by limiting Gilmore's claim for relief to the amount of the bonus and the escrow deposit and by not allowing the jury to determine whether he was entitled to his expectancy from the sale upon a finding of breach of the covenant of good faith by the Duderstadts.

### 5. Remand of Breach of Contract Claim

{26} Gilmore claims that, even on the limited issues considered by the jury, it resolved all factual issues in his favor to support a finding of breach of contract relating to the purchase portion of the contract, and, therefore, he is entitled to a remand of the case for a new trial on the sole issue of damages. In particular, Gilmore claims that the jury found the following: (1) the Duderstadts led Gilmore to believe that the rent would not be increased during the trial period; (2) the Duderstadts breached the contract when they increased the rent; and (3) Gilmore met the 10% net profit condition. Although the jury may have reached the first and third determinations of fact, we cannot agree that the jury ever specifically found that the Duderstadts breached the contract by increasing the rent during the trial period.

{27} The jury was instructed on the breach of contract claim for the payment of the bonus as follows:

To establish the claim [sic] of breach of contract, Mr. Gilmore has the burden of proving at least one of the following contentions:

1. The defendant, Laubo ... breached the contract by failing to pay his bonus because it improperly calculated the net profits of Laubo ... by failing to include an insurance recovery and/or including training material expense before determining profit and/or improperly increasing the rental expense before determining profit, and/or failing to properly credit Mr. Duderstadt's credit charge expenditures.

Because the jury instruction was couched in terms of the conjunctive *or* the disjunctive, we have no way of knowing whether the jury based its verdict on a finding that the Duderstadts breached the contract by improperly increasing the rent. The jury could have determined a breach of contract based on any one of the four conditions listed in the trial court's jury instruction. Even though the jury found that the Duderstadts misled Gilmore to believe that rent would not be increased during the trial period and that Gilmore relied on the Duderstadts' misrepresentations in entering into the contract, this finding was made in connection with Gilmore's tort claim of negligent misrepresentation and is not determinative of a finding of breach of contract. *See Parker v. E.I. Du Pont de Nemours & Co.,* 121 N.M. 120, 132, 909 P.2d 1, 13 (Ct.App.1995) (identifying elements of negligent misrepresentation claim). Therefore, because it is uncertain whether the jury found that the Duderstadts breached the contract by increasing the rent during the trial period, we reverse the directed verdict and remand the case for a retrial on the merits of the breach of contract claim relating to the purchase portion of the contract. *See Kirkpatrick v. Introspect Healthcare Corp.,* 114 N.M. 706, 713, 845 P.2d 800, 807 (1992) (remanding for trial on merits of breach of contract claim noting that the appellate court will not determine questions of fact on appeal). However, we hold that, upon retrial of the breach of contract claim, Gilmore's expectancy damages, if any, should not include the amounts of the bonus and the escrow deposit awarded to Gilmore in the first trial. *See Hood v. Fulkerson,* 102 N.M.

677, 680, 699 P.2d 608, 611 (1985) (holding that duplication of damages or double recovery is impermissible). To prevent a claim of double recovery on appeal, we suggest that all components of recovery be identified in the jury instructions to the extent possible. Finally, upon retrial of the breach of contract claim, the parties and the trial court shall have due regard for the law of the case doctrine. *See Elephant Butte Irrigation Dist. v. Regents of New Mexico State Univ.,* 115 N.M. 229, 232, 849 P.2d 372, 375 (Ct.App. 1993) ("[T]he law of the case doctrine applies to issues raised on remand that were addressed and decided at the appellate level.").

### B. *Punitive Damages*

{28} We next address Gilmore's contention that the trial court erred in refusing to submit the issue of punitive damages to the jury. In a breach-of-contract case, punitive damages are allowable only upon "a showing of bad faith, or at least a showing that the breaching party acted with reckless disregard for the interests of the nonbreaching party." *Paiz v. State Farm Fire & Cas. Co.,* 118 N.M. 203, 210, 880 P.2d 300, 307 (1994); *see also Romero v. Mervyn's,* 109 N.M. 249, 255, 784 P.2d 992, 998 (1989) (Punitive damages are recoverable for breach of contract when the defendant's conduct was "malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights."). However, because punitive damages are designed to punish and deter bad faith conduct, and not to interfere with the parties' freedom to allocate risks and benefits by agreement, *see Romero,* 109 N.M. at 257, 784 P.2d at 1000, a punitive damages award must be premised on "some evidence of a culpable mental state." *Construction Contracting & Management, Inc. v. McConnell,* 112 N.M. 371, 375, 815 P.2d 1161, 1165 (1991).

{29} Defendants argue that Gilmore failed to demonstrate a culpable mental state on the part of the Duderstadts, because the increase in rent during the trial period was the result of a legitimate business decision by the Duderstadts which, as a matter of law, will not support an award of punitive

damages. However, in *Romero,* our Supreme Court stated:

> Overreaching, malicious, or wanton conduct such as targeted by our rule is inconsistent with legitimate business interests, violates community standards of decency, and tends to undermine the stability of expectations essential to contractual relationships. When this is the case, it is appropriate to allow the jury to determine whether "the public interest will be served by the deterrent effect punitive damages will have upon future conduct."

*Romero,* 109 N.M. at 258, 784 P.2d at 1001 (quoting *Jones v. Abriani,* 169 Ind.App. 556, 350 N.E.2d 635, 649 (1976)).

{30} We conclude that Gilmore presented sufficient evidence of the Duderstadts' culpable mental state to support his claim of punitive damages. Because the testimony shows that the Duderstadts had been unable to make the 10% net profit, even with the lower rent charge, the jury could reasonably infer from this testimony that the Duderstadts knew that increasing the rent would undermine Gilmore's ability to achieve the 10% net profit condition and thereby defeat his right to purchase the company under the terms of the bootstrap agreement. *See Paiz,* 118 N.M. at 211, 880 P.2d at 308 (Culpable mental state exists when "defendant acts with 'reckless disregard' for the rights of the plaintiff—i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless 'utterly fail[s] to exercise care' to avoid the harm."). Gilmore also presented evidence from which a jury could reasonably conclude that the Duderstadts overreached and abused their "insider" position as landlords when they increased the rent unilaterally without informing him, after leading Gilmore to believe, through the company's financial records, that the rent would remain $15,000 per month while Gilmore was striving to make a 10% net profit during the trial period. Gilmore also presented expert testimony that the Duderstadts' failure to accrue back-due rent on the company's financial statements had the effect of misrepresenting and overstating Laubo's net profits by approximately $90,000. *Cf. Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.,* 113 N.M. 9, 14–15, 820 P.2d 1323, 1328–29 (1991) (holding that misrepresentations about profitability of business made recklessly with intent to deceive supported award of punitive damages). The jury could reasonably infer the Duderstadts' bad faith and callous disregard for Gilmore's right to purchase the business based on Mrs. Duderstadt's testimony that, after their retirement, the Duderstadts continued using Laubo's corporate credit card for their personal use, including vacations and car repairs, and charged these expenditures against Gilmore's net profit during the trial period. Finally, the evidence of the Duderstadts demanding an additional $200,000 to allow Gilmore to proceed, could reasonably be seen as evidence of bad faith and overreaching on their part.

{31} Therefore, we conclude that Gilmore presented sufficient evidence of the Duderstadts' culpable mental state so as to require the trial court to instruct the jury on the issue of punitive damages. *See Romero,* 109 N.M. at 257, 784 P.2d at 1000 (recognizing that evidence of breach of implied covenant of good faith and fair dealing may support punitive damages). The trial court erred in refusing to submit the issue of punitive damages to the jury, and we reverse the trial court's directed verdict on this issue as well. *See Yardman v. San Juan Downs, Inc.,* 120 N.M. 751, 756, 906 P.2d 742, 747 (Ct.App.1995) (party is entitled to instruction on theory of case when there is evidence to support such instruction).

### C. *Sufficiency of the Evidence*

{32} In their cross-appeal, Defendants assert that there was insufficient evidence to support the bonus and the negligent misrepresentation claims. We determine that substantial evidence was presented to support both claims.

{33} First, to support his claim for the bonus, Gilmore presented expert accounting testimony and demonstrative evidence of net profit calculations, showing that he had made a 10.25% net profit by May 31, 1993 and a 10.38% net profit by September 1993, and, therefore, was entitled to receive a bonus in accordance with the contract. Next, to support his negligent misrepresentation claim,

Gilmore testified that, during the contract negotiations, he reviewed Laubo's profit and loss statements which showed only the lower rent charge and no accrual of liability for back-due rent. According to the testimony of Gilmore's expert, as well as testimony from the Duderstadts' attorney, the failure to show any accrual of liability for back-due rent on the financial statements resulted in misrepresenting Laubo's net profits by approximately $90,000. Relying on the misleading information, Gilmore believed that he could make a 10% net profit and consequently entered into the contract.

{34} Defendants point to evidence of alternative net profit calculations showing that, during the trial period, Gilmore had made only a 7.69% net profit, if an adjustment was made only for the difference between the rental increase and Mr. Duderstadt's prior salary, or a 9.99% net profit if an adjustment was made for the rental increase but not for two accounting errors. Defendants also cite to testimony that Gilmore knew, before entering into the contract, that he would be charged rent during the trial period based on the rate of $245,000 per year. However, we consider these to be matters of conflicting evidence for the jury to resolve, which do not defeat a finding of substantial evidence. *See Pucci Distributing Co. v. Nellos,* 110 N.M. 374, 376, 796 P.2d 595, 597 (1990). In reviewing a substantial evidence claim, the question is not whether substantial evidence would have supported the opposite result; it is whether substantial evidence supports the result reached. *See State ex rel. Martinez v. Lewis,* 118 N.M. 446, 447, 882 P.2d 37, 38 (Ct.App.1994).

{35} Finally, because we reverse the directed verdict, we need not reach Defendants' contention that the trial court erred in denying their motion for judgment notwithstanding the verdict on the basis that its denial was inconsistent with the trial court's earlier directed verdict ruling and the contract provisions.

### D. *Prejudgment Interest and Costs*

{36} Before trial, Defendants made an offer of judgment of $75,000, inclusive of costs, under Rule 1–068 NMRA 1998. After trial, the jury returned verdicts in favor of Gilmore totaling $62,266.39. Upon Gilmore's motion for prejudgment pursuant to NMSA 1978, §§ 56–8–3 (1983) and 56–8–4 (1993), the trial court awarded prejudgment interest on the jury awards at the rate of 8 3/4%. The amount of the final judgment, including the award of prejudgment interest, was $76,-747.31, exclusive of costs.

{37} Gilmore contends that the trial court erred in refusing to award his costs in this action because he was a prevailing party under Rule 1–054(E) NMRA 1998, and because the amount of the final judgment entered in his favor exceeded the offer of judgment tendered by Defendants. Defendants assert that the trial court erred in awarding prejudgment interest on the negligent misrepresentation damages under Section 56–8–4(B), and that they are entitled to their costs incurred after the offer of judgment.

{38} We first consider whether the trial court properly awarded prejudgment interest. Apparently, Defendants do not dispute that under Section 56–8–3 Gilmore was entitled to prejudgment interest on the bonus award as a matter of right. *See* § 56–8–3(A)–(C); *Sunwest Bank v. Colucci,* 117 N.M. 373, 377, 872 P.2d 346, 350 (1994) (discussing purpose and effect of awarding prejudgment interest under Section 56–8–3). Defendants' only contention appears to be that the trial court erred in awarding prejudgment interest on the $50,000 award for negligent misrepresentation claim under Section 56–8–4(B).

{39} Our review of the record and the transcript indicates that the trial court's award of prejudgment interest was predicated on Section 56–8–3, rather than Section 56–8–4(B). In his motion, Gilmore asserted Section 56–8–3 as the primary basis for prejudgment interest; Section 56–8–4(B) was asserted only as an alternative basis for relief. Although the trial court's letter decision and judgment fail to specify the statutory basis for awarding prejudgment interest, we still conclude that the trial court applied Section 56–8–3, rather than Section 56–8–4(B). We so conclude because ultimately it awarded prejudgment interest in a manner consonant

with the provisions of Section 56–8–3. According to the letter decision, the trial court awarded prejudgment interest at the rate of 8 3/4% on the bonus award from August 1, 1993 to June 10, 1996, the date of judgment, and on the escrow deposit award, from November 1, 1993 to June 10, 1996. Thus, it awarded prejudgment interest, not from the date of service of the complaint, as authorized under Section 56–8–4(B), but from the dates it determined Gilmore was entitled to payment of the bonus and the return of his escrow deposit, that is, from the time it believed Gilmore's claims accrued. *See Colucci*, 117 N.M. at 377, 872 P.2d at 350 (Prejudgment interest under Section 56–8–3 is "to compensate a claimant for the lost opportunity to use money owed the claimant and retained by the obligor *between the time the claimant's claim accrues and the time of judgment.*") (emphasis added). Thus, we conclude that the trial court applied Section 56–8–3, rather than 56–8–4(B), and awarded prejudgment interest on both awards as a matter of right.

{40} Defendants do not contend that the trial court incorrectly applied Section 56–8–3 in awarding prejudgment interest. Further, Defendants do not assert in their cross-appeal that Section 56–8–3 was an improper basis for awarding prejudgment interest on the negligent misrepresentation damages. Thus, we need not address in this opinion whether it was proper for the trial court to award prejudgment interest on the $50,000 award under Section 56–8–3, which normally applies only to breach of contract damages, where the award represents *tort* damages yet is also an amount fixed and ascertainable from the contract and is the return of money extended on the contract.

{41} Finally, turning to the issue of costs, we hold that, as a prevailing party, Gilmore was entitled to an award of his costs under Rule 1–054(E) and Rule 1–068. In *Dunleavy v. Miller*, 116 N.M. 365, 372, 862 P.2d 1224, 1231 (Ct.App.1992), *aff'd in part, rev'd in part on other grounds,* 116 N.M. 353, 862 P.2d 1212 (1993), we recognized that, under Rule 1–054(E), a " 'prevailing party' means the party who wins the lawsuit[,]" and that Rule 1–068 does not alter the commonly

accepted definition of "prevailing party" under Rule 1–054. "Thus, a party who rejected a settlement offer and subsequently prevailed on the issues but received less than the offer should still be considered the prevailing party and be entitled to receive costs incurred before the settlement offer was made." *Dunleavy,* 116 N.M. at 372, 862 P.2d at 1231; *see also* Rule 1–068 NMRA 1998 ("If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer."). Thus, even assuming that Gilmore's recovery was less than the offer of judgment, at the very least, he was entitled to his pre-offer costs as a prevailing party. However, the trial court denied Gilmore *all* of his costs. We hold that this was clearly in error under the rules of civil procedure and *Dunleavy.*

{42} We further hold that Gilmore was entitled to his *post*-offer costs. Defendants contend that because the amount of the judgment, excluding the prejudgment interest, was less favorable than the offer of judgment, the trial court correctly denied Gilmore his costs. In essence, Defendants argue that prejudgment interest should not be included in the "judgment finally obtained by the offeree" for purposes of comparing the amount of the judgment to that of the offer of judgment in determining who is responsible for post-offer costs. According to Defendants' argument, the amount of the jury verdicts in favor of Gilmore should be compared to the offer of judgment. Thus, this case raises a question of first impression concerning the meaning of the term, "judgment finally obtained," under Rule 1–068, and whether it includes the amount of prejudgment interest awarded by the trial court, or whether it is to be equated with the jury verdict. We hold that the "judgment finally obtained" includes the amount of prejudgment interest awarded by the trial court.

{43} Defendants' argument ignores the plain meaning of the language employed in Rule 1–068. In *Poole v. Miller,* 342 N.C. 349, 464 S.E.2d 409, 410–11 (1995), the Supreme Court of North Carolina applied the plain meaning rule to its identical version of Rule 68 for purposes of determining whether

the term, "judgment finally obtained," meant the jury's verdict or the final judgment which included costs and interest. Because we agree with the court's analysis in *Poole*, we adopt a similar analysis with respect to our Rule 1–068.

{44} In construing rules of procedure, we apply the same canons of construction as applied to statutes and, therefore, interpret the rules in accordance with their plain meaning. *See State v. Eden*, 108 N.M. 737, 741, 779 P.2d 114, 118 (Ct.App.1989). "When the language of the rule is not defined in the rule, [we give it] its ordinary meaning." *Id.* The word "judgment" is not defined in Rule 1–068. We, therefore, accord it its ordinary meaning. A "judgment" is "[t]he final decision of the *court* resolving the dispute and determining the rights and obligations of the parties. The law's last word in a judicial controversy[.]" *Black's Law Dictionary* 841–42 (6th ed.1990) (emphasis added). "Verdict" means "[t]he formal decision or finding made by a *jury* [.]" *Id.* at 1559 (emphasis added). Because only a court may enter a judgment, the "judgment finally obtained" cannot be equated with the jury's verdict. *See Purwin v. Robertson Enters., Inc.*, 506 A.2d 1152, 1154–55 (Me.1986) (rejecting claim that "judgment finally obtained" means jury verdict and holding that costs should be awarded when final judgment, including jury award and prejudgment interest, amounted to more than rejected offer). Thus, we conclude that the prejudgment interest included in the final judgment should be considered in comparing it to Defendants' offer of judgment under Rule 1–068.

{45} Moreover, because the prejudgment interest awarded in this case was in the nature of damages to compensate Gilmore for the loss of use and earning power of the funds retained by the Duderstadts, *see Colucci*, 117 N.M. at 377, 872 P.2d at 350, it constitutes a portion of Gilmore's recovery of damages and should be considered in evaluating whether Gilmore's recovery was more favorable than the offer of judgment. *See Davis v. Chism*, 513 P.2d 475, 480–81 (Alaska 1973) (holding that prejudgment interest is in the nature of compensatory damages and therefore should be included in "judgment finally obtained").

{46} Thus, based on the plain language of Rule 1–068 and the other principles noted above, we hold that the "judgment finally obtained" by Gilmore includes the amount of prejudgment interest awarded by the trial court. Because the total judgment, including prejudgment interest, was $76,747.31 and, therefore, more favorable than the $75,000 offer of judgment, Gilmore is entitled to all of his costs under Rules 1–054(E) and 1–068.

## III. *CONCLUSION*

{47} Based on the foregoing, we reverse the trial court's directed verdicts and remand for a retrial on the merits of Gilmore's breach of contract claim for compensatory damages arising from the loss of the sale and the issue of punitive damages. We affirm the jury's award of the bonus and negligent misrepresentation awards. We also affirm the trial court's award of prejudgment interest in favor of Gilmore. Finally, we reverse the trial court's denial of costs to Gilmore and remand for the entry of an order, after the retrial, awarding Gilmore his costs in this action.

{48} **IT IS SO ORDERED.**

BOSSON and BUSTAMANTE, JJ., concur.