(August 4, 2015)

■ Jerry Beinstein et al., Respondents, v Gagan Navani et al., Appellants, et al., Defendants. [14 NYS3d 362]—

Order and judgment (one paper), Supreme Court, New York County (Saliann Scarpulla, J.), entered February 28, 2014, declaring that plaintiffs are entitled to receive defendants Navani and Sahi's down payment for the subject condominium unit in the amount of $365,000 and that after payment of the down payment amount to plaintiffs the contract is null and void, and dismissing defendants' counterclaim for specific performance, affirmed, without costs.

Plaintiffs are the sellers, and defendants Navani and Sahi the purchasers, under a purchase and sale agreement relating to a condominium apartment. Plaintiffs seek a declaratory judgment that defendants breached the agreement by failing to close despite plaintiffs' full performance. Defendants seek specific performance on the basis that their refusal to schedule a closing was justified by plaintiffs' failure to satisfy a condition precedent to closing. The dispute relates to the apparently uncontested facts that, before the parties executed the contract, the board of managers had determined that the firestopping throughout the building, including in all of the individual apartments, was inadequate and that, at the time the contract was executed, the board was still in the midst of a significant project to complete the firestopping.

Defendants claim that they did not learn of the firestopping

situation until July 27, 2012, more than a month after they signed the contract. On August 12, 2012, defendants' lawyer sent a letter to plaintiffs' counsel stating that "based on the life-safety and other issues surrounding 416 Washington Street and the fact that such substantive issues were never properly disclosed to them beforehand, my clients . . . have made the decision not to go forward with their prospective purchase of Unit 5E." The letter also demanded the return of defendants' contract deposit. Over the next two months, the parties apparently had some discussions about resolving the impasse, while the escrow agent continued to hold the deposit. Finally, by letter dated October 17, 2012, plaintiffs' counsel advised defendants' counsel that "[i]t is clear from our conversations and your clients' actions that the above referred to Purchaser is no longer interested in proceeding to closing and purchasing the Unit. If the Purchasers are prepared to close please contact me immediately and we can proceed accordingly." By letter dated October 26, 2012, defendants' counsel responded, stating: "This letter will serve to confirm that my clients . . . are prepared to purchase the above reference [sic] unit from your clients.

"We are ready to set a closing date as soon as: 1) we receive the information set forth in my e-mail (attached) to the Managing Agent; 2) we complete a re-inspection of the Unit (at my clients' expense, of course, and after authorization from your client; [sic] and 3) after the updated title search has been received and reviewed." The email referenced in the letter and attached thereto included a request for, inter alia, "confirmation and evidence that the firestopping work has been completed on Unit 5E . . . including permits, paid invoices, and municipal sign off (if any)." Plaintiffs' counsel responded to the letter the very same day, stating: "Although you have indicated that your clients . . . are prepared to purchase the above Unit, this is to confirm that I have advised you that I do not know under what agreement you are prepared to close, as your clients breached the Contract of Sale dated June 18, 2012. While our clients are amenable to negotiate a new Contract of Sale for the premises, at the present time no agreement has been reached for the sale of the premises in question. Your indication that my partner's October 17, 2012 correspondence somehow undoes your clients' breach of Contract, it is rejected [sic]. My partner's correspondence indicates that our client would be willing to close this matter but certainly not under the terms of the conditions [sic] of the Contract of Sale dated June 18, 2012.

"If your clients wish to negotiate the terms of a new Contract of Sale, as my partner's October 17, 2012 letter indicates, our clients will be willing to entertain same."

Defendants' counsel responded by insisting that plaintiffs breached the contract by failing to ensure that the unit was adequately protected from fire. However, he acknowledged that his clients had since been told that the firestopping had been completed, and reiterated their willingness to set a closing date upon receipt of the information and documentation demanded in the email appended to the October 26, 2012 letter. Plaintiffs' counsel replied in a letter in which he rejected the notion that completion of the firestopping project was a condition precedent to plaintiffs' performance.

After plaintiffs formally demanded that the escrow agent release the contract deposit to them, and upon defendants' counter-demand that he continue to hold the deposit in escrow, plaintiffs commenced this declaratory judgment action. Defendants filed a lis pendens and asserted a counterclaim for breach of contract and specific performance. The counterclaim was based on the lack of firestopping in the unit, which, as alleged by defendants, violated the New York City Building Code and rendered the unit unsuitable for legal occupancy. Defendants did not identify any particular provision of the contract that plaintiffs had breached.

Before any discovery had been conducted, plaintiffs moved for summary judgment. They argued that the contract explicitly provided that the unit was being sold as is, that it contained no representations as to the unit's condition other than what was expressly set forth therein, and that it expressly provided that they had no obligation to restore, alter or repair the premises. Plaintiffs contended that, even after they offered to close despite the purported cancellation in August 2012, defendants' insistence on confirmation that the firestopping had been completed constituted an effort to impose a new condition on the purchase that was not contained in the contract that had been executed by the parties.

In opposition, defendants invoked, for the first time, paragraph 6 (c) (ii) of the contract, and asserted that plaintiffs had breached the contract by not complying with it. That paragraph provided: "It is a condition of Purchaser's obligation to close title hereunder that . . . [a]ny written notice to Seller from the Condominium (or its duly authorized representative) that the Unit is in violation of the Declaration, By-Laws or rules and regulations of the Condominium shall have been cured. If the cost of compliance . . . exceeds an aggregate of $50,000.00,

Seller may cancel the contract unless Purchaser chooses to accept a credit of $50,000.00 and close subject to the violations."

Defendants argued that plaintiffs breached the clause because the condominium's bylaws and rules and regulations required that "all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereof shall be observed," and 1968 Building Code of City of New York (Administrative Code of City of NY) § 27-345 expressly required the unit to be properly firestopped.

The IAS court granted plaintiffs' motion and declared that plaintiffs were entitled to payment of the contract deposit. The court held that defendants repudiated the contract in August 2012 when they informed plaintiffs that they did not intend to perform under the contract because of the firestopping issue. Defendants offered no evidence that the unit or the building was in violation of the New York City Building Code, and, in any event, information about the lack of firestopping had been available to defendants, and they had decided, nonetheless, to accept the unit as is. The court further stated that since time had not been declared to be of the essence, plaintiffs were entitled to an opportunity to cure the firestopping situation before defendants summarily declared the contract cancelled. Finally, the court held that defendants' conditional acceptance of plaintiffs' offer in October 2012 to schedule a closing "can not be considered a retraction of the repudiation."

On appeal, defendants argue that they did not repudiate the contract because, given plaintiffs' purported breach of paragraph 6 (c) (ii), which required them to clear the unit of all violations of the condominium's governing documents, they had no obligation to perform. Even if they did repudiate the contract, they posit, they effectively retracted the repudiation when they conditionally accepted plaintiffs' October 2012 offer to schedule a closing. They claim that their insistence on receiving certain information, including proof that the firestopping work had been completed, did not constitute an imposition of new terms, but rather an exercise of rights that were already guaranteed by the contract. Finally, defendants assert that, at the very least, the court should have denied summary judgment without prejudice to renewal of the motion upon the completion of discovery.

Plaintiffs argue that defendants repudiated the contract because they presented no evidence that, as required by paragraph 6 (c) (ii), the condominium had notified them of any violations of its governing documents. Further, they contend that defendants failed to retract their repudiation because they

conditioned the scheduling of a closing on the receipt of information to which they were not entitled.

Defendants' appeal is entirely dependent upon the soundness of their position that plaintiffs were contractually obligated to complete the firestopping work in the unit. To answer that question it is necessary to consider the language in the contract, for that is what controls the parties' rights and responsibilities. We are guided by the standard rules of contractual interpretation, which provide that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). Further, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004] [internal quotation marks omitted]).

The clause of the contract that defendants assert was breached by plaintiffs is paragraph 6 (c) (ii). That clause is very clear and specific as to what it required of plaintiffs. It obligated them to clear the unit of "[a]ny *written notice* to Seller from the Condominium (or its duly authorized representative) that *the Unit* is in violation of *the Declaration, By-Laws or rules and regulations of the Condominium*" (emphasis added). Defendants claim that the clause was breached because the condominium's rules and regulations required that "all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereof shall be observed" by each unit owner. They further assert that included among those laws and regulations is 1968 Building Code of City of New York (Administrative Code of City of NY) § 27-345, which requires firestopping of "[c]oncealed spaces."

Defendants' argument has several flaws. First, defendants fail to demonstrate that the condominium delivered a written notice to plaintiffs that they were in breach of the condominium's governing documents for any reason. Instead, they rely on a letter dated January 23, 2012, five months before the agreement was executed, in which the condominium's board of managers updated all of the condominium's unit owners on the condominium's finances and on certain anticipated and ongoing construction work. A section entitled "Fire stopping" stated, in pertinent part: "The fire stopping work in the corridors is largely complete. The next, and hopefully final phase, is to fire stop all units. In order to do so, Bone Levine must inspect and perform scopes in all units to determine the work to be done.

We must do the fire stopping work to address code violations and deficient conditions."* This letter cannot possibly constitute the type of notice contemplated by paragraph 6 (c) (ii). First, it was not delivered to plaintiffs for the purpose of informing them that they had breached the declaration, by-laws or rules and regulations of the condominium, but rather to inform them of the status of the firestopping, as well as various other condominium matters. Significantly, it did not instruct plaintiffs to cure any such breach, as one would ordinarily expect such a notice to do. Contrary to the dissent's position, paragraph 6 (c) (ii) clearly refers to violations that the condominium expected plaintiffs to cure, not those that the condominium agreed to address itself. This is confirmed by the provision allowing plaintiffs to cancel the contract (or give defendants a credit) if the cost to them of curing exceeded $50,000. Moreover, the letter did not state, as the contract clause required, that the subject unit itself was in violation of the Building Code. It alluded generally to code violations, but it is impossible to tell whether the unit itself had been the subject of a notice of violation issued by the Department of Buildings. Indeed, it can be presumed that, had such a notice of violation been issued, defendants would have presented a copy of the notice, which is a matter of public record, in connection with this motion. To interpret the letter as the "written notice" described in paragraph 6 (c) (ii) would contravene the rules of contract construction outlined above. Accordingly, defendants cannot establish that plaintiffs had not fulfilled a condition precedent to their own performance.

Second, defendants point to no provision in the contract that justifies their initial purported reason for canceling the contract, which was that it threatened the safety of themselves and their children. Nor do they claim that plaintiffs somehow prevented them from learning of the firestopping issue. To the contrary, the contract itself referred expressly to a July 19, 2011 notice from the board of managers that discussed the status of the then ongoing firestopping project. This was sufficient to place defendants on notice of a potential issue that might have given them pause to execute an agreement in which they acknowledged they were accepting the unit as is.

Because defendants had no right to insist that the firestopping issue be resolved as a condition to closing, their "retraction" of the purported repudiation was ineffective. In order to be effective, a retraction of a contract repudiation must be

---

* Defendants claim that they never saw this letter while performing their due diligence.

bona fide (*see Bykowsky v Eskenazi*, 2 AD3d 115 [1st Dept 2003]). Defendants' acceptance of plaintiffs' offer to schedule a closing was not bona fide, because it was conditioned on plaintiffs' provision of documents and information establishing to defendants' satisfaction that the firestopping had been completed. We disagree with the dissent that the letter from defendants' counsel conditionally retracting the repudiation creates an issue of fact as to whether it was bona fide. That letter unquestionably adhered to defendants' position, which had supported the initial repudiation, that plaintiffs had a contractual obligation to ensure proper firestopping in the apartment before delivering the deed. The clear implication of the letter was that, if plaintiffs could not establish to defendants' complete satisfaction that the firestopping work had been performed, defendants would once again refuse to close. As stated above, this position was untenable, and clearly, contrary to the dissent's view, sought to insert an additional material term or condition into the contract. Again, nothing in the contract required plaintiffs to perform any firestopping, and plaintiffs were entitled to view defendants' continued insistence on proof that they had done so as a justified refusal to perform under the agreement. Concur—Gonzalez, P.J., Mazzarelli, Manzanet-Daniels and Clark, JJ.

Saxe, J., dissents in a memorandum as follows: In this appeal, we must determine whether defendant purchasers anticipatorily repudiated their contract with plaintiffs for the sale of a residential condominium unit, and, if they did, whether they effectively retracted that repudiation. In my view, the purchasers did not repudiate the contract by insisting that firestopping work be completed and approved before they closed on the sale, but, even if they did, they effectively retracted the earlier repudiation.

Facts

On June 18, 2012, the parties entered into a contract for the sale of a residential condominium unit; the purchasers' deposit of 10% of the $3,650,000 purchase price was held by the sellers' then-attorney as escrowee. The contract scheduled the closing to take place on or about August 1, 2012, but there was no "time of the essence" provision.

A rider to the contract, which provided that it governed in the case of any inconsistency with the contract, recited that the purchasers represented that they had viewed the premises and the sale was "as is," and, further, disclaimed any representation by the sellers about the physical condition of the premises. Nevertheless, paragraph 6 (c) (ii) of the contract made it "a

condition of Purchaser's obligation to close" that "[a]ny written notice to Seller from the Condominium . . . that the Unit is in violation of the Declaration, By-Laws or rules and regulations of the Condominium shall have been cured."

The rules and regulations of the condominium required compliance with all valid laws and regulations of all governmental bodies, and further required that violations be eliminated by and at the expense of the unit owners or the board of managers, whichever had the obligation to maintain or repair such portion of the property. In this regard, the New York City Building Code (*see* Administrative Code of City of NY § 27-345) requires firestopping to prevent the spreading of interior fires.

On January 23, 2012, approximately five months before the parties entered into the contract, the condominium board of managers had notified the unit owners in writing that the firestopping in the corridors was largely complete and that the next phase was to firestop all units "to address code violations and deficient conditions." Purchaser Navani contends that it was only after they entered into the contract that the purchasers learned that the subject unit still needed firestopping (from a conversation with the building's superintendent on July 27, 2012) and only learned of the board's January 23, 2012 letter after that.

The closing did not take place on the contract's closing date of August 1, 2012.

On August 3, 2012, the purchasers' counsel by letter demanded the return of the deposit, and advised that, "based on the life-safety and other issues surrounding [the building] and the fact that such substantive issues were never properly disclosed to them beforehand," her clients "ha[d] made the decision not to go forward with their prospective purchase."

The sellers' counsel responded by email on August 6, 2012, asserting that the return of the deposit was not authorized under the contract and rejecting as false the allegations in the letter from the purchasers' counsel received August 3rd. However, rather than declaring that the purchasers' decision not to go forward with the purchase was a breach justifying the sellers' termination of the contract, he encouraged the purchasers to relent and go through with the transaction by asserting that "the Seller expects the Purchaser to comply with the contract of sale and close title to the Unit once the Board's [firestopping] work is completed. If the Purchaser thereafter fails or refuses to still close title in this matter, the Seller will take appropriate steps to protect itself including declaring *Time of the Essence* for the Purchaser."

Thereafter, by letter dated August 13, 2012, the purchasers' counsel requested the return of the deposit, asserting that the sellers had not fulfilled their obligation under the contract to deliver the unit in a safe condition. No response from the sellers or their counsel appears in the record.

Apparently, the firestopping of the unit was completed some time in October 2012.

After further discussions between counsel, by letter dated October 17, 2012, the sellers' counsel advised the purchasers' counsel that "[i]t is clear from our conversations and your clients' actions that the above referred to Purchaser is no longer interested in proceeding to closing and purchasing the Unit." However, as in his August 6 email, he did not declare the contract terminated, did not propose that the parties renegotiate the deal and enter into a new contract, and did not express an understanding that the purchasers were proposing a new contract. Instead, he again sought to encourage the purchasers to close, saying, "If the Purchasers are prepared to close please contact me immediately and we can proceed accordingly."

The purchasers' counsel responded by letter on October 26, 2012, confirming that her clients were ready to purchase the unit, stating: "We are ready to set a closing date as soon as: 1) we receive the information set forth in my e-mail (attached) to the Managing Agent; 2) we complete a re-inspection of the Unit (at my client's expense, of course, and after authorization from your client[)]; and 3) after the updated title search has been received and reviewed. (I should be receiving title today, if not Monday).

"Please contact me upon receipt of this letter so that we can work together to collect information and set a closing date."

The attached email requested that the condominium board provide various items of information regarding construction and repairs in the building and indicate whether there would be assessments to pay for them. The information requested included information about the schedule to firestop the other units and "confirmation and evidence that the firestopping work [on the unit] has been completed . . . including permits, paid invoices, and municipal sign off (if any)."

The sellers' counsel responded immediately, by a different attorney at the law firm. This letter stated: "Although you have indicated that your clients . . . are prepared to purchase the above Unit, this is to confirm that I have advised you that I do not know under what agreement you are prepared to close, as your clients breached the Contract of Sale dated June 18, 2012.

While our clients are amenable to negotiate a new Contract of Sale for the premises, at the present time no agreement has been reached for the sale of the premises in question. Your indication that my partner's October 17, 2012 correspondence somehow undoes your clients' breach of Contract, it is rejected [sic]. My partner's correspondence indicates that our client would be willing to close this matter but certainly not under the terms of the conditions [sic] of the Contract of Sale dated June 18, 2012.

"If your clients wish to negotiate the terms of a new Contract of Sale, as my partner's October 17, 2012 letter indicates, our clients will be willing to entertain same."

The purchasers' counsel reiterated her clients' willingness to set a closing date upon receipt of the information requested, and the sellers' counsel denied that completion of the firestopping work was a condition precedent to his clients' obligation to close. Thereafter, the sellers' counsel demanded that the escrowee release the deposit to them, while the purchasers' counsel demanded that he continue to hold it in escrow. The sellers then commenced this action seeking a declaration that they were entitled to the purchasers' deposit, based on the purchasers' refusal to close, which constituted a repudiation that rendered the contract null and void. The purchasers seek a contrary declaration and specific performance of the contract of sale.

The sellers moved for summary judgment on their complaint dismissing the defenses and counterclaim for specific performance, maintaining that the contract stated that the unit was "as is" and disclaimed any representations about the condition of the unit. In opposition, the purchasers argued that in view of the board's January 23, 2012 letter to the unit owners advising of the need to complete firestopping "to address code violations and deficient conditions," and the condominium rules and regulations incorporating by reference the Building Code firestopping requirement, paragraph 6 (c) (ii) of the contract entitled the purchasers to a cure of the violation as a condition to closing.

In reply, the sellers claimed that the purchasers had notice of the firestopping issue when they signed the contract, pointing to a footnote to the buyer's rider, which mentioned a July 19, 2011 notice from the board. They submitted that notice with their reply; it addressed assessments for construction work and stated, "The biggest unknown remains the fire stopping project. By [its] very nature, fire stopping costs remain uncertain until the work is actually performed."

Supreme Court granted the sellers' motion and declared the sellers entitled to the deposit, finding that the purchasers had repudiated the contract on August 3, 2012 by refusing to close because of the firestopping issue. The court reasoned that the purchasers had failed to offer evidence that the unit or the building were in violation of the Building Code, and that, in any event, based on the January 23, 2012 board notice to the unit owners and the July 19, 2011 notice referring to the firestopping work, information about the lack of firestopping was available to the purchasers when they decided to accept the unit as is.

Finally, the motion court found that the purchasers' counsel's October 26, 2012 communication was not a retraction of the repudiation.

Discussion

Resolution of this appeal turns on the issues of repudiation and retraction of a repudiation.

The first question is whether the information the purchasers belatedly received regarding the need for firestopping in the building—including in the subject unit—entitled them to insist that the firestopping work in the unit be completed before they closed on the sale. Framed another way, we must decide whether the need for firestopping work constituted a condition of the purchaser's obligation to close, under paragraph 6 (c) (ii) of the sale contract. That paragraph made it "a condition of Purchaser's obligation to close" that "[a]ny written notice to Seller from the Condominium . . . that the Unit is in violation of the Declaration, By-Laws or rules and regulations of the Condominium shall have been cured."

The majority concludes that the purchasers had no right to delay closing under that provision, reading paragraph 6 (c) (ii) of the sale contract as limited to situations where the condominium gives a unit owner a notice of violation requiring the unit owner to take action to cure the violation, and inapplicable to violations the condominium board chooses to address itself. It reasons that the board's January 23, 2012 letter notifying unit owners of the progress and future plans for firestopping work did not constitute written notice to the sellers from the condominium that their unit was in violation of the condominium's governing documents.

I disagree. While the board's letter was not denominated a notice of violation to the sellers as individual owners of their particular unit, it in effect constituted notice to them, as to all unit owners, that each unit, along with the entire building, was in violation of the condominium's rules, in that it violated

a City Department of Buildings regulation requiring firestopping (Administrative Code § 27-345). I fail to see how the added language in contract paragraph 6 (c) (ii), allowing the seller to cancel the contract if the cost of curing a violation is more than $50,000 and the purchaser declines to accept a credit of $50,000 and close subject to the violation, establishes that the type of notice of violation to which this contract provision applies is limited to those in which the board requires the unit owner to undertake the cure.

The majority's contention that "it is impossible to tell whether the unit itself had been the subject of a notice of violation issued by the Department of Buildings" misses the point. The entire building, including all the units, was in violation of the regulation and thus required curative work. It is of no moment that the sellers were not personally served with a notice of violation specifically regarding their apartment. That the board opted to cure the violation throughout the building, rather than demanding that unit owners independently perform the necessary work within their own units, does not justify a conclusion that the sellers' unit was not in violation of the regulation.

This analysis merely addresses what type of document could constitute written notice to the sellers from the condominium that their unit was in violation of a regulation. It does not distort the meaning of contract paragraph 6 (c) (ii) or otherwise contravene the rules of contract construction.

Once the purchasers learned that a condition existed that they were entitled to insist be cured before they closed on the sale, they properly informed the sellers of that fact. Doing so was not an anticipatory breach of the contract.

However, even accepting the assumption that the purchasers repudiated the contract on August 3, the sellers, through their responsive August 6 communication, and in their October 17 communication, indicated their continued willingness to close, and encouraged the purchasers to do so. In the face of a repudiation, the sellers had the option to terminate the contract and declare the purchasers in breach; however, instead of terminating it, they elected to treat the contract as valid and to seek a date for closing (*see Deforest Radio Tel. & Tel. Co. v Triangle Radio Supply Co.*, 243 NY 283, 292 [1926]; *Bykowsky v Eskenazi*, 2 AD3d 115 [1st Dept 2003]; *AG Props. of Kingston, LLC v Besicorp-Empire Dev. Co., LLC*, 14 AD3d 971 [3d Dept 2005]). While continuing to treat the contract as valid does not forfeit the right to bring an action for anticipatory breach if the nonrepudiating party fails to perform or to retract the repudia-

tion (*see AG Props.*, 14 AD3d at 974), it allows the repudiating party the opportunity to retract its repudiation, at least until such time as the nonrepudiating party changes its position.

The central focus of this analysis is whether the purchasers' October 26 response to the sellers' October 17 letter constituted an acceptance of the sellers' invitation to proceed on the contract, and a retraction of their earlier repudiation.

An effective retraction of a repudiation must be both timely and bona fide (*Bykowsky v Eskenazi*, 2 AD3d at 115). To be timely, a retraction must have been issued without the nonrepudiating party's having materially changed its position, to its detriment, in reliance on the repudiation (*see Dembeck v Hassler*, 248 AD2d 148, 149 [1st Dept 1998], *lv denied* 92 NY2d 805 [1998]; *Silverman Perlstein & Acampora v Reckson Operating Partnership*, 303 AD2d 576, 577 [2d Dept 2003]).

The retraction here was timely. Notably, the purchasers' October 26 letter preceded the later communication of the same date from the sellers' attorney, advising that the sellers considered the repudiation to be final. The sellers failed to adduce evidence to show that they had materially and detrimentally changed their position in reliance on the initial claimed repudiation before the time of the purchasers' October 26 letter.

On the question of whether the October 26 retraction was bona fide, the sellers contend that the purchasers attempted to add conditions to the contract, rendering the retraction ineffective. Similarly, the majority holds that the purchasers' October 26 letter cannot constitute a bona fide retraction of their August 3 repudiation, because the purchasers continued to adhere to their condition that the firestopping work be completed, which in the majority's view was not justified by the contract.

However, in my view, this mischaracterizes the requests in the purchasers' October 26 letter and misperceives their import. To be clear: the purchasers indicated their willingness to close as soon as they obtained information (from the board) regarding additional costs that might be assessed against the unit based on work performed after the contract was executed; a reinspection of the premises, at their own expense, reasonable since work was completed on the unit after execution of the contract; and the results of the already ordered new title search, also reasonable, considering the possibility of new liens related to the newly performed work. In my view, the expressed need to await receipt of these documents did not constitute an imposition of new terms or conditions such as would make a purported retraction ineffective.

It has been held in other jurisdictions that a retraction is ineffective if it seeks to add terms or conditions to the contract (*see Ratliff v Hardison*, 219 Ariz 441, 445, 199 P3d 696, 700 [Ct App 2008]; *Anderson Excavating & Wrecking Co. v Sanitary Improvement Dist. No. 177*, 265 Neb 61, 69, 654 NW2d 376, 383 [2002]; *Gilmore v Duderstadt*, 125 NM 330, 336, 961 P2d 175, 181 [Ct App 1998]; *Vahabzadeh v Mooney*, 241 Va 47, 51, 399 SE2d 803, 805 [1991]; *Pichignau v City of Paris*, 264 Cal App 2d 138, 142, 70 Cal Rptr 147, 149 [1968]; *Vision Entertainment Worldwide, LLC v Mary Jane Prods., Inc.*, 2014 WL 5369776, *6, 2014 US Dist LEXIS 154099, *16-17 [SD NY, Oct. 17, 2014, No. 13 Civ 4215 (AT)]). While there is no appellate authority in this State clearly setting out this rule, I accept for these purposes that New York authorities on the general subject of the retraction of repudiation (*see e.g. Bykowsky*, 2 AD3d 115) support the equivalent rule, that the attempted imposition of new terms or conditions by a party purporting to retract a repudiation should be considered a lack of good faith.

However, the type of non-material or non-essential information that the purchasers raised in their October 26th letter, namely, an updated inspection and title search, and documentation to be obtained from the board, does not amount to the type of new contract terms and conditions that the rule contemplates.

The cases discussing the imposition of new contract terms in a retraction refer to terms that are indisputably material. For example, in *Pichignau v City of Paris* (264 Cal App 2d 138, 70 Cal Rptr 147 [1968]), the plaintiff's employer sought to retract its repudiation of her employment contract by offering to reemploy her but expressly without reinstating her contract or employing her for the remainder of its term, and purported to give itself the option to discharge her on short notice and the right to insist that her contract had been terminated at the time of her initial discharge. In *Gilmore v Duderstadt* (125 NM 330, 961 P2d 175 [1998]), the repudiating purchaser of a business sought to require the payment of an additional $200,000 for his retraction. And in *Ratliff v Hardison* (219 Ariz 441, 199 P3d 696 [2008]), while the court primarily held the purported retraction ineffective because it was ambiguous, it was also noted that the repudiating party had not indicated his willingness to meet the nonrepudiating seller's purchase price.

The rule that the retraction of a repudiation must not seek to add terms or conditions therefore should be understood to mean that the party attempting to retract a repudiation may not seek to add essential, material or significant terms or condi-

tions to the contract. It is not required that the retraction exactly mirror the contract the way an acceptance must reflect the offer; there is no prohibition against the attempted addition of non-material or non-essential provisions, so long as there is a manifestation of a clear intent to treat the contract as valid and enforceable and a willingness to perform.

The purchasers' requests here did not materially deviate from the essential obligations under the contract of sale or add significant ones, and required virtually no additional performance by the sellers. It was undisputed that the firestopping work in the building had already been completed; the purchasers sought nothing more than information and documentation related to that work, including information regarding additional costs that might be assessed against the unit based on work performed after the contract was executed. This information and documentation was to be provided by the condominium board manager, and did not impose any obligation on the sellers. The purchasers also sought a reinspection of the premises, but only with the sellers' consent and at their own expense, presumably with respect to work that was completed after the execution of the contract, and their counsel indicated that a new title search, possibly in order to disclose any liens related to the newly performed work, had already been ordered and would be received by her imminently.

Relief for a claimed breach of contract will be denied unless the breach is material or so substantial as to strongly tend to defeat the object of the contract (*see e.g. Bisk v Cooper Sq. Realty, Inc.*, 115 AD3d 419 [1st Dept 2014]; *Smolev v Carole Hochman Design Group, Inc.*, 79 AD3d 540, 541 [1st Dept 2010]), and a repudiation may be found where the new terms the repudiating party seeks to add to the contract are material or essential (*see e.g. IBM Credit Fin. Corp. v Mazda Motor Mfg. [USA] Corp.*, 92 NY2d 989, 993 [1998] [untenable interpretation of "key" contract provision]; *Richmor Aviation, Inc. v Sportsflight Air, Inc.*, 82 AD3d 1423, 1425 [3d Dept 2011] [no "essential" term repudiated]). A similar standard should apply to determining whether a repudiation has been retracted.

A purported retraction is rendered ineffective by the proposed addition of a *material* term to the contract (*see Vahabzadeh v Mooney*, 241 Va at 51, 399 SE2d at 805 [purported retraction rendered ineffective by addition of a "tax-free exchange" as condition for settlement]; *Ratliff v Hardison*, 219 Ariz at 446, 199 P3d at 701 [buyer who re-affirmed that he still wanted to obtain the land but was "unwilling to meet his obligation to pay for it" did not make bona fide retraction of his repudia-

tion]). However, if the repudiating party makes a "positive and unequivocal statement of his desire to once again abide by the contract" (*Ratliff v Hardison*, 219 Ariz at 446, 199 P3d at 701), that bona fide retraction is not negated by a request that is non-material and non-essential and does not alter the material terms of the extant contract.

None of the proposals in the purchasers' October 26 letter evinced bad faith so as to justify a conclusion that *as a matter of law* their retraction of their August 3 repudiation was not bona fide. To the extent the sellers may raise a question as to the purchasers' intent in seeking these additional items, that would merely present an issue of fact as to whether the purchasers' retraction of their repudiation was bona fide.

The majority also reasons that the October 26 letter by the purchasers' counsel cannot constitute a bona fide retraction of their repudiation, because it continued to adhere to what the majority considers an improperly imposed condition to closing, the requirement that the firestopping work first be completed. But, on October 26 there was no question that the firestopping work *had already* been completed; so, in that letter, the completion of the work clearly was not meant to be a condition to closing. All the purchasers indicated they would need before closing was an essentially negligible amount of easily obtained additional information. Nothing in the letter constituted a continued imposition of a condition to closing.

Finally, the responsive October 26 communication from the sellers' counsel, purporting to refer to a prior termination of the contract, was disingenuous, amounting to an ineffective attempt to disavow the effect of his partner's communications of October 17 and August 6. Neither of those earlier communications in which the sellers' counsel explicitly expressed a desire to set a new closing date made the deal contingent on the execution of a new contract, indicated that renegotiation of the deal would be necessary, or terminated the contract. Indeed, the threat in the sellers' August 6 email to declare time of the essence could only have made sense if the sellers continued to consider the contract to be still in effect.

For the foregoing reasons, I dissent.