(April 6, 2017)

■ DEBORAH KELLER-GOLDMAN, Respondent, v JACOB GOLD-MAN, Appellant. [52 NYS3d 17]—

Judgment of divorce, Supreme Court, New York County (Matthew F. Cooper, J.), entered October 15, 2015, to the extent appealed from, adhering to the court's interpretation that there was a cap on the "room and board" credit provision of the parties' Stipulation of Settlement and Agreement in its August 19, 2015 order, affirmed, without costs. Appeal from order, same court and Justice, entered August 19, 2015, which granted plaintiff's motion to the extent of interpreting the parties' agreement as providing a cap on defendant's credit against his child support obligations, dismissed, without costs, as subsumed in the appeal from the judgment.

The parties entered into a Stipulation of Settlement and Agreement (the agreement) that resolved all issues surrounding their separation. Although they had four unemancipated children, the agreement only provided for support for the three children for whom plaintiff mother was the custodial parent. Defendant father retained custody of the fourth child, but agreed to receive no support for him from the mother. Had the parties not negotiated the issue of child support, the mother stood to collect $5,000 per month in child support payments, pursuant to the Child Support Standards Act, a fact acknowledged by the agreement. Instead, she agreed to monthly child support payments of $2,500.

Paragraph 10.3 of the agreement provided for a graduated reduction in the father's child support payments upon the emancipation of the three children, to wit: upon the first emancipation his monthly payment would be reduced to $2,150 per month; and upon the second emancipation the payment would be reduced to $1,462 per month. Attendance at college, the agreement's definition of which included a "gap year" at a yeshiva or seminary in Israel, was not considered an emancipation event. However, the agreement did provide, in paragraph 10.4, immediately following the support reduction schedule: "During the period in which a Child is attending a college and residing away from the residences of the parties and [the father] is contributing towards the room and board expenses of that Child, [the father] shall be entitled to a credit against his child support obligations in an amount equal to the amount

[the father] is paying for that Child's room and board. The credit shall be allocated in equal monthly installments against [the father's] child support payments."

At the time the agreement was negotiated and executed, the eldest of the three children in the mother's custody was attending a 10-month seminary program in Israel. The father, who was responsible under the agreement for the entire tuition and for room and board, paid approximately $12,000 for the latter expense. Relying on the language from paragraph 10.4 of the agreement, quoted above, the father, prior to a judgment of divorce having been entered, informed the mother that he was due a credit towards his total monthly child support obligation of $2,500, in the amount of approximately $1,200. The mother then moved by order to show cause for a declaration that the pending judgment include language making clear that any credit due the father would be capped in accordance with the graduated emancipation reduction provided for in the immediately preceding paragraph 10.3 of the agreement. In other words, she interpreted that formula as defining the amount of child support due the particular child in question as $350 ($2,500 minus $2,150, the amount to be paid after emancipation of that child), and sought to limit the father's credit to that amount. She noted that under the father's construction of the agreement, he could, in theory, completely deprive one or two of her children of support if he paid enough in room and board for the other child or children that the credit would wipe out the obligation.

The father opposed the motion and cross-moved for, inter alia, an order awarding him expenses, costs and fees incurred in responding to the mother's motion. The father stressed that the court was required to enforce the plain language of the agreement, which, again, with respect to the child studying in Israel, granted him "a credit against his child support obligations in an amount equal to the amount [he] is paying for that Child's room and board." Since that amount was $1,200 a month, the father reasoned, he was entitled to a credit in that amount.

In oral argument on the motions, the court opined that, as a matter of public policy, the agreement could not be enforced as written. It expressed deep concern with the possibility that one or two of the children could be deprived of any child support because the father was paying room and board for their sibling or siblings in an amount that exceeded the amount owed the mother. The court stressed the fact that the father was already enjoying a reduction in the presumptive support amount

provided by the Child Support Standards Act. The court ultimately entered a judgment of divorce that clarified that the provision allowing the father a credit against his child support obligations is capped at the amount identical to the decrease in monthly child support when such child becomes emancipated.

A stipulation of settlement which, like the one at issue here, is incorporated but not merged into a judgment of divorce, is a contract subject to the ordinary principles of contract construction and interpretation (*see Matter of Meccico v Meccico*, 76 NY2d 822, 823-824 [1990]; *Rainbow v Swisher*, 72 NY2d 106 [1988]; *Kosnac v Kosnac*, 60 AD3d 636 [2d Dept 2009]). These rules provide that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms . . . [and] courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Beinstein v Navani*, 131 AD3d 401, 405 [1st Dept 2015] [citations and internal quotation marks omitted]). In the specific realm of settlement agreements defining a parent's child support obligations, there is a presumption that the agreement reflects what the parties believed to be a fair and equitable division of the financial burden to be assumed in rearing the child (*see Matter of Trester v Trester*, 92 AD3d 949, 950 [2d Dept 2012]). However, this Court has articulated a very important caveat to that principle: "[T]he parties cannot contract away the duty of child support. Despite the fact that a separation agreement is entitled to the solemnity and obligation of a contract, when children's rights are involved the contract yields to the welfare of the children. The duty of a parent to support his or her child shall not be eliminated or diminished by the terms of a separation agreement, nor can it be abrogated by contract" (*Matter of Thomas B. v Lydia D.*, 69 AD3d 24, 30 [1st Dept 2009] [internal quotation marks and citations omitted]).

The agreement here violates this rule. The credit sought by the father takes away that portion of child support intended for the welfare of the other two children. Taken to its logical end, the agreement threatens to completely deprive the other children of any support whatsoever, if monthly room and board costs for one child were to exceed $2,500. The dissent does not question the principle this Court enunciated in *Thomas B.*, which makes all but irrelevant the dissent's adherence to traditional canons of contractual interpretation. Neither *Matter of Brandt v Peirce* (132 AD3d 665 [2d Dept 2015]) nor *Schulman v Miller* (134 AD3d 616 [1st Dept 2015], *appeal dismissed*

27 NY3d 947 [2016]), both discussed by the dissent, deals with a situation where a child was threatened with a potential loss of support. Similarly, *Meshel v Meshel* (146 AD3d 595 [1st Dept 2017]) did not involve a result that conflicted with public policy.

*Thomas B.* is also instructive insofar as it demonstrates that it is appropriate for courts, in ensuring the fairness of child support provisions in divorce agreements, to look beyond the plain language chosen by the parties. In that case, the parties had stipulated that the father's obligation to support the child would terminate when the child turned 21 or was otherwise emancipated, defining "emancipation," unambiguously, as "engaging in fulltime employment" (69 AD3d at 25). The father sought to end his support payments when the child, in fulfilling a condition of a substance abuse recovery program, obtained a 35-hours-per-week job at a music store. The mother objected, and this Court agreed, relying on case law holding that, as a matter of public policy, a child cannot be considered emancipated, regardless of how clearly and unambiguously the parties defined that term in an agreement, unless he or she is "economically independent," a finding that could be not be made based on the facts in *Thomas B.* (*id.* at 30).

As in *Thomas B.*, there is precedent to help us interpret the agreement here in a manner that is consistent with public policy. In *Lee v Lee* (18 AD3d 508 [2d Dept 2005]), in considering whether the father might have to at some future point have to pay the children's college expenses, the court stated: "[I]t is not the defendant's overall child support obligation, which in this case encompasses his duty to support four children, that might properly be reduced on account of his payment of 'college expenses' on behalf of one or more of those children; rather, the 'college expenses' paid on behalf of one particular child, or on behalf of some particular children, could properly serve as a credit only with respect to so much of the defendant's overall child support obligation as it relates to such particular child or children" (18 AD3d at 512; *see Matter of Levy v Levy*, 52 AD3d 717, 718-719 [2d Dept 2008]). It is irrevelant that *Lee* did not involve a negotiated settlement agreement. It is, however, in accordance with *Thomas B.*, completely appropriate to look to *Lee* as authority that establishes public policy concerning child support provisions like the one at issue here, and to interpret the provision in a manner consistent with that public policy.

We recognize that Domestic Relations Law § 240 (1-b) (h) permits parties to deviate by agreement from the basic child support obligation. However, that section also provides that

the court shall retain discretion with respect to child support. That discretion unquestionably extends to invalidating those provisions in agreements that violate public policy, as the court did here. Further, we do not believe that enforcing a specific and narrow public policy, will, as the dissent fears, "create confusion, uncertainty, and even chaos."

Another reason why we agree with the wife's interpretation of the agreement is because, while it is important for a court to adhere to the plain language of an agreement in interpreting it, it is also true that "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" (*Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413, 415 [1st Dept 2010] [internal quotation marks omitted]). The reasonable expectation of the parties when they executed the agreement, based on its plain language, was that the father would support each child individually until that child was emancipated. This can be deduced from the fact that paragraph 10.3 of the agreement reduced the total support amount after the emancipation of the first, and then the second, child. Insofar as the credit provision is the one that immediately follows, it was reasonable for the mother to interpret that provision as making clear that attendance at college or a gap year program is effectively a "temporary emancipation," where no support payment is necessary for the child because the child is not a financial burden on the mother. At the same time, the credit provision prevents the mother from realizing a windfall by collecting child support for a child who, temporarily, is not a household expense. Reading the agreement this way, the two provisions can be understood as being in harmony with each other, which is a goal when construing any contract (*see Gessin Elec. Contrs., Inc. v 95 Wall Assoc., LLC*, 74 AD3d 516, 518 [1st Dept 2010]). We are unaware of any rule of construction limiting the ability to harmonize two or more separate contraction clauses to instances where they explicitly cross-reference each other. Indeed, to interpret the credit provision as negating the child support promised for each child in the preceding provision would be an untenable construction, and the absurd result we are admonished against producing. Concur—Sweeny, J.P., Mazzarelli and Webber, JJ.

Andrias and Gesmer, JJ., dissent in a memorandum by Andrias, J., as follows: Supreme Court, under the guise of contract interpretation, read a nonexistent cap into section 10.4 of the parties' Stipulation of Settlement and Agreement, which, expressly gave defendant a credit against his overall

child support obligations equal to the amount he paid for a child's room and board while away at an educational institution. A majority of this Court would affirm, finding that section 10.4 violates the rule that parties cannot contract away the duty of child support and that the reasonable expectation of the parties was that defendant would support each child until emancipated, not that he could use the room and board credit for one child to reduce or eliminate support for other children.

I do not agree. The parties negotiated a comprehensive settlement agreement under which they resolved all equitable distribution, custody, maintenance and support issues, with defendant, inter alia, assuming full responsibility for all tuition and education expenses and other statutory add-ons. Under these circumstances, enforcement of the room and board credit provision, pursuant to its unambiguous terms, does not run afoul of the public policy imperative with respect to child support. There is simply no basis for rewriting the parties' comprehensive settlement agreement to the sole benefit of plaintiff. The majority's abrogation of the principles of contract interpretation will create confusion, uncertainty, and even chaos, as to the enforceability of settlements in the future, thereby undermining the strong public policy favoring the prompt and peaceful resolution of divorce disputes. Equally troubling is that the parties, during the negotiations and in the agreement, fully complied with the provisions of section 240 (1-b) (h) of the Domestic Relations Law, which provides that "[n]othing contained in this subdivision shall be construed to alter the rights of the parties to voluntarily enter into validly executed agreements or stipulations which deviate from the basic child support obligation provided such agreements or stipulations comply with the provisions of this paragraph." Therefore, I dissent.

The parties, represented by highly regarded and experienced counsel, entered into a 55-page Stipulation of Settlement and Agreement, dated December 31, 2014, which was allocuted by the court and "so ordered" on January 8, 2015 (the agreement). By its express terms, the agreement, which provided that it would survive any decree or judgment of separation or divorce and not merge therein, was intended to fully determine the parties' respective financial and property rights, the care and custody of their unemancipated children, and all other respective rights, remedies, privileges and obligations to each other, arising out of the marriage.

Under the agreement, defendant was obligated to pay plaintiff $395,000 in equitable distribution and $1,500 per

month in maintenance for five years, subject to specified contingencies. Section 8.5 of the agreement provided that the three older children would spend an equal amount of time with each parent. Nonetheless, the parties agreed in section 10.1 that defendant would pay basic child support to plaintiff in the sum of $2,500 per month for those three children (then 15, 17 and 18), for whom plaintiff was deemed the custodial parent. The parties also agreed in section 8.5 that the youngest child, then nine, would have primary custody with defendant. However, although defendant was deemed the custodial parent of that child, he waived any claims against plaintiff for child support.

Pursuant to section 10.3 of the agreement, defendant's basic support obligation for the children in plaintiff's custody would be reduced to $2,150 per month when one child becomes emancipated and $1,462 per month when a second child becomes emancipated, and would terminate when the third child becomes emancipated. During the 5½-year period after the emancipation of the third child, plaintiff would not contribute at all to the support of the youngest child, who would continue to live primarily with defendant. Defendant was also obligated to pay 100% of the children's health insurance, unreimbursed medical and dental expenses, school tuition, summer camp tuition, tutoring and therapy, and college tuition (subject to a cap based on the tuition at SUNY Binghamton).

In negotiating the child support due plaintiff, the parties expressly agreed to deviate from the provisions of the Child Support Standards Act (CSSA) guidelines, as is expressly permitted under section 240 (1-b) (h) of the Domestic Relations Law. To accomplish this, all of the required safeguards of section 240 (1-b) (h) were strictly adhered to in the agreement. Section 10.9 (n) informed the parties that the applicable child support due plaintiff for their three oldest children under the guidelines would have been $4,996.68 per month (which, absent the negotiated settlement, would have been offset by the amount of child support that plaintiff would have been obligated to pay defendant for the youngest child in defendant's custody). Section 10.9 (n) also explained that the parties arrived at the agreed upon sum of $2,500 per month, after taking into consideration numerous factors, including: (i) the financial resources of the parties; (ii) the children's needs; (iii) the standard of living the children would have enjoyed had the marriage or household not been dissolved; (iv) the tax consequences for the parties; (v) the nonmonetary contributions that the parties would make toward the care and well-being of the chil-

dren; (vi) defendant's custody of the parties' youngest child and his waiver of child support from plaintiff; (vii) defendant's agreement to pay 100% or the children's school expenses (which included basic tuition and other items regularly billed); and (viii) the statutory add-on expenses defendant had agreed to pay pursuant to the agreement.

Section 10.4 of the agreement provided that "[d]uring the period in which a Child is attending a college and residing away from the residences of the parties and [defendant] is contributing towards the room and board expenses of that Child, [defendant] shall be entitled to a credit against his child support obligations in an amount equal to the amount [defendant] is paying for that Child's room and board. The credit shall be allocated in equal monthly installments against [defendant's] child support payments. For the purposes of this provision, 'college' includes any educational institution, wherever located, for which [defendant] is paying for a Child's room and board, including but not limited to the one-year post high school programs referenced in section 10.7 (d) below."

Section 10.7 (d) included "one (1) year of post-high school yeshiva or seminary in Israel for each Child."

On or about April 9, 2015, before a judgment of divorce had been entered, plaintiff moved "[f]or the Court to clarify the issue of credit from room and board off child support" under the agreement. The application arose out of a dispute between the parties as to the credit that defendant was entitled to as a result of their eldest daughter's attendance at a seminary in Israel, for which defendant reported paying in excess of $12,000, which plaintiff does not dispute.

Plaintiff argued that defendant was not entitled to the dollar for dollar room and board credit he was claiming, and that the credit for a particular child was to be capped to the amount that child support was to be reduced in the event of that particular child's emancipation. Plaintiff posited that if defendant's position was adopted, he could potentially reduce his overall child support payments to nothing, even though she would still have children at home. Defendant opposed the motion and cross-moved for, inter alia, an order awarding him expenses, costs and fees incurred in responding to plaintiff's motion. Noting that their daughter was already attending seminary in Israel when the agreement was drafted, defendant argued that the unambiguous language of section 10.4 entitled him to a credit against the child support payments "in an amount equal to the amount [he] is paying for that Child's room and board," without limitation.

The motion court adopted plaintiff's position and ordered that "[d]efendant shall pay [p]laintiff any arrears owed on child support in light of this Order clarifying the cap on the room and board credit." The court then signed the judgment of divorce on appeal which stated that section 10.4 of the agreement "is interpreted as capping such credit at the amount identical to the decrease in monthly child support when such child becomes emancipated." This determination was in error.

"A stipulation of settlement that is incorporated but not merged into a judgment of divorce is a contract subject to principles of contract construction and interpretation" (*Kraus v Kraus*, 131 AD3d 94, 100 [2d Dept 2015]). "[W]here the terms of a written contract are clear and unambiguous, and the intent of the parties can be gleaned from the four corners of the document, the contract should be enforced in accordance with its plain meaning" (*Meshel v Meshel*, 146 AD3d 595, 596 [1st Dept 2017]; *see also Dimond v Dimond*, 105 AD3d 891, 892 [2d Dept 2013] ["Where the stipulation is clear and unambiguous on its face, the intent of the parties must be gleaned from the four corners of the instrument, and not from extrinsic evidence" (internal quotation marks omitted)]). "A court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, and it may not construe the language in such a way as would distort the contract's apparent meaning" (*Matter of Scalabrini v Scalabrini*, 242 AD2d 725, 726 [2d Dept 1997]; *see also Brantly v Brantly*, 89 AD3d 881, 882 [2d Dept 2011] [courts cannot "rewrite the unambiguous terms of a marital stipulation"]).

Applying these principles, the plain and natural meaning of the phrase "the Husband shall be entitled to a credit against his child support obligations in an amount equal to the amount the Husband is paying for that Child's room and board," is that defendant is entitled to just that, "an amount equal to" the amount he is paying for room and board (*see Meshel v Meshel*, 146 AD3d at 596-597). The agreement does not provide for a cap on the credit, and to insert such a cap would improperly add a term or condition to an otherwise heavily negotiated agreement, where both parties were represented by counsel, under the guise of contractual interpretation (*see Matter of Brandt v Peirce*, 132 AD3d 665 [2d Dept 2015]; *Schulman v Miller*, 134 AD3d 616 [1st Dept 2015], *appeal dismissed* 27 NY3d 947 [2016]).

In *Brandt*, the parties' separation agreement provided that "[t]he father will receive a dollar for dollar credit in Child Support for every dollar he spends on the Children's college, room

and board" (132 AD3d at 667). The father paid for the child's college expenses using funds from a 529 account. The appellate court found that the "plain and natural meaning of the parties' words entitle[d] the father to the credit for 'every dollar' that the father '[spent]' on the children's college, room, and board, without limitation" and that the father had "spent" money and was entitled to the credit because he funded the 529 account (*id.*). In *Schulman*, this Court enforced a matrimonial stipulation of settlement where the agreement was "an exhaustive, 62-page document" and "[b]oth parties were represented by counsel during its negotiation" (134 AD3d at 616).

Citing *Matter of Thomas B. v Lydia D.* (69 AD3d 24 [1st Dept 2009]), the majority finds that the agreement violates the rule that parties cannot contract away the duty of child support, a "principle . . . which makes all but irrelevant the dissent's adherence to traditional canons of contractual interpretation." The majority maintains that *Brandt* and *Schulman* are inapposite because neither "deals with a situation where a child was threatened with a potential loss of support," whereas here "[t]he credit sought by the father takes away that portion of child support intended for the welfare of the other two children" and threatens to deprive the children of any support whatsoever (citing *Thomas B.* at 30).

In *Thomas B.*, the issue was whether the father was entitled to abate his child support obligation because the son's full-time employment was an emancipation event under the parties' stipulation of settlement. Noting that, pursuant to statute, parental child support obligations continue until the child attains the age of 21 (Family Ct Act § 413 [1] [a]), unless the child is sooner emancipated, and that a finding of emancipation terminates the parental obligation of support, this Court held that parents of a child under the age of 21 may not, by written agreement, terminate the child support obligation because of a child's full-time employment, without a simultaneous showing of the economic independence of a child.

In the matter before us, we are not dealing with the termination of child support based on an alleged emancipation event. Rather, in consideration for defendant voluntarily assuming the obligation to pay the full cost of the parties' daughter's room and board during her year at a seminary in Israel, defendant, as in *Brandt*, is being given a negotiated dollar-for-dollar credit against his basic child support obligation for the children.

*Meshel v Meshel* (146 AD3d 595 [1st Dept 2017], *supra*) is instructive. In *Meshel*, the parties' revised stipulation modified

the custody and financial stipulations and judgment of divorce by granting the ex-husband sole custody of the parties' son, and provided that, for the support of their daughter, he would pay $5,000 per month instead of the $6,000 per month he was paying for both children. The ex-wife subsequently moved to bar the ex-husband from deducting their son's college expenses for room and board from his child support payments for their daughter. Citing traditional canons of contract interpretation, we held that the parties' revised stipulation did not modify the divorce judgment's provision giving him credit against all monthly child support payments for any and all amounts contributed toward the cost of the son's room and board while away at college. Thus, the ex-husband was entitled to deduct his son's college room and board charges from his monthly child support payments for the daughter (*id.* at 596-597; *see also Matter of Tannenbaum v Gilberg*, 134 AD3d 846, 847 [2d Dept 2015] ["determination that the father was entitled to a credit against his basic child support obligation for college room and board paid by him for the parties' two older children was consistent with the terms of the parties' stipulation of settlement" in divorce action; "the mother's alternative argument, that the stipulation of settlement provided for a maximum amount upon which the credit could be applied, is without merit"]).

*Lee v Lee* (18 AD3d 508 [2d Dept 2005]), on which the majority relies, does not mandate a different result. In *Lee*, the divorce judgment was a decision after trial and did not contain a "provision requiring the husband to pay the cost of any 'present or future . . . post-secondary, private, special, or enriched education for the child[ren]' (Domestic Relations Law § 240 [1-b] [c] [7])" (*id.* at 511 [internal quotation marks omitted]). Consequently, the Second Department found premature the proviso giving the defendant a dollar-for-dollar credit toward his child support obligation in the event he had to pay such tuition.

Although the Second Department did state in *Lee* that a credit for college expenses "could properly serve as a credit only with respect to so much of the defendant's overall child support obligation as relates to such particular child or children" (*id.* at 512), *Lee* did not involve an agreement under which the terms of the credit had been negotiated by the parties as part of a comprehensive settlement. While the majority believes that the absence of an agreement is irrelevant, in negotiating a settlement the parties could trade off financial distributions and obligations so as to reach an overall result

acceptable to both of them. In contrast, the trial judge in *Lee* had no choice but to assess each financial provision in the judgment separately, allowing the court to properly cap the credit for college expenses.

The majority alternatively states that while the plain language of the agreement may support defendant's position, " 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties' " (quoting *Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413, 415 [1st Dept 2010]). In affirming the imposition of a nonexistent cap, the majority opines that the reasonable expectation was that child support for a child would continue until that child was emancipated, which conflicts with defendant's interpretation that he is entitled to a dollar-for-dollar credit for one child's room and board against his overall support obligation. However, the plain language of section 10.4 provides for no such cap. Nor does the agreement suggest that the parties intended for the room and board credit to be subject to a cap tied to the emancipation reductions. Section 10.4 does not reference section 10.3 and section 10.3 does not reference section 10.4. As various provisions in Article X, for example, contain references to other sections, the fact that sections 10.3 and 10.4 do not contain any such references is telling. Indeed, the majority's interpretation would unfairly limit defendant's room and board credit to a fraction of the negotiated amount, while at the same time enforcing the provisions of the agreement that require him to pay, in addition to a child's tuition, the full cost of a child's room and board while at a seminary or a college.

Moreover, while the majority is concerned about the effect of the credit on the older children, it disregards the effect of its position on the youngest child, and on defendant's ability to care for the older children. This is not a traditional situation where the father sees the children only on weekends. Rather, the three oldest children divide their time equally between the parents, and the youngest lives primarily with defendant. Thus, defendant, like plaintiff, must provide a home suitable for all of the children.

Furthermore, while, generally, "[a] parent's duty to support his or her child until the child reaches the age of 21 years is a matter of fundamental public policy in New York" (*Matter of Cellamare v Lakeman*, 36 AD3d 906, 906 [2d Dept 2007], *appeal dismissed* 8 NY3d 975 [2007]), "[w]here the parties have included child support provisions in the agreement, it is

presumed that in the negotiation of the terms of the agreement the parties arrived at what they felt was a fair and equitable division of the financial burden to be assumed in the rearing of the child" (*Matter of Trester v Trester*, 92 AD3d 949, 950 [2d Dept 2012] [internal quotation marks omitted]). Here, plaintiff knowingly agreed to a compromise which was less than what she was entitled to under the child support guidelines. In return for that deviation, defendant, among other things, assumed responsibility for 100% of tuition and room and board expenses and other statutory add-ons, as well as the full support obligation for the youngest child, who would remain in his custody and would be the last to be emancipated. The sum and substance of the agreement of the parties is consistent with defendant's duty of support, and plaintiff is free to make a motion for an upward modification of the unallocated support, obligation upon a proper showing of a substantial change in circumstances, in which case she and defendant would have to submit current net worth statements which the court could evaluate. However, we should not rewrite the agreement in order that plaintiff might achieve this end (*see Schulman v Miller*, 134 AD3d at 617). Indeed, the majority's holding would undermine the long-standing public policy in favor of settlements in divorce actions by creating uncertainty as to their enforceability.

Nor is the enforcement of the agreement pursuant to its unambiguous terms manifestly inimical to public policy. Section 240 (1-b) (h) of the Domestic Relations Law provides that parties may deviate from the CSSA provided that their agreements or stipulations "include a provision stating that the parties have been advised of the provisions of this subdivision, and that the basic child support obligation provided for therein would presumptively result in the correct amount of child support to be awarded. In the event that such agreement or stipulation deviates from the basic child support obligation, the agreement or stipulation must specify the amount that such basic child support obligation would have been and the reason or reasons that such agreement or stipulation does not provide for payment of that amount."

Section 10.9 of the agreement substantially provided each acknowledgment and advisement required by section 240 (1-b) (h) and the agreed upon child support provisions do not violate public policy.

Accordingly, I would vacate the language interpreting section 10.4 of the parties' agreement to place a cap on defendant's credit against his child support obligations.